171 P.2d 325

THURMOND v. ESPALIN et al.

No. 4925.

Supreme Court of New Mexico.

June 27, 1946.

Rehearing Denied Aug. 21, 1946.

Thos. B. Rapkoch, of Las Cruces, and John T. Hill, of El Paso, Tex., for appellants.

Edwin Mechem, of Las Cruces, for appellee.

BICKLEY, Justice.

This is a suit by plaintiff (appellee) to quiet title to a tract of land, claiming title by adverse possession. Defendants, claiming three-tenths interest in the land, challenge the plaintiff's claim of title.

The following constitute the Findings of Fact and Conclusions of Law of the Court:

"1. That the plaintiff in the year 1929 obtained a quitclaim deed to the land in question.

"2. That he immediately entered into the possession of the same and has ever since been in the open, exclusive, notorious, peaceable and adverse possession of the same and has paid all taxes levied and assessed against said land for more than ten years prior to the bringing of this action.

"Conclusions of Law.

"1. That the plaintiff is entitled to a decree quieting his title to the land described in the complaint.

"2. That the defendants have no right, title or interest in or to said land."

The court rendered judgment in favor of plaintiff and against defendants.

Certain evidentiary facts gleaned from virtual admissions in the briefs are as follows:

Refugio Espalin, a bachelor, had title to the land in question. He had two brothers, Jose L. and Damacio. Damacio died, leaving as his heirs the appellants in this case and two sons, Damacio and Ramon. Jose L. deeded his one-half interest to his wife, Matilda W. Espalin. April 5, 1929, Matilda W. Espalin executed and delivered a styled quitclaim deed to the lands involved to the appellee Benton S. Thurmond, which deed was recorded April 6, 1929. Ever since that time Thurmond has been in the possession of the lands and has paid the taxes thereon. Thurmond forthwith fenced the lands theretofore unfenced, used it for stock grazing and lately a small portion for raising crops.

About a week (April 13, 1929) after procuring and recording the deed plaintiff Thurmond procured an affidavit from two old timers stating that Matilda Espalin was a co-owner of an individual interest to half the land in question and that the other undivided one-half interest was owned by the heirs of Damacio Espalin. It is claimed by appellants that there is evidence from which the inference might be drawn that the facts stated in the affidavit were known to Thurmond at the time he received the conveyance to him.

The appellants requested a number of findings of fact, all of which were refused, among which is the following: "At the time the deed was executed and delivered, Burton S. Thurmond, plaintiff, knew there were relatives of Matilda Wood Espalin and family whose father was the brother of Jose Espalin and Refugio Espalin."

The evidence is such that reasonable men might draw different inferences therefrom. Had the trial court made the quoted requested finding of fact we might have been unable to say that the evidence did not warrant such finding, but on the other hand since we are required to indulge reasonable presumptions in support of the trial court's judgment and decisions as to questions of fact, we are unable to say that the trial court was in error in refusing this request of defendants.

Appellants' (defendants') contention is that the record does not show that the plaintiff established adverse possession. They argue that there is an absence of showing of good faith in the acquisition of the color of title relied upon by plaintiff. They also argue that the plaintiff did not assert a claim of right to the entire interest in the land in good faith. They say: "appellee's contention is that a quit claim deed in form can be a color of title the same as

a warranty deed or any other instrument of conveyance. Appellants agree to this proposition."

In State v. United States Coal & Oil Co., 86 W.Va. 256, 103 S.E. 50, it was decided: "A quitclaim deed, describing by metes and bounds the land remised, is good color on which to base a claim of title, regardless of whether or not the grantor appears to have any interest in or title to the land."

The court remarked in that case that: "The principal purpose of color is not to show actual grant of the land or of any interest therein, but is to designate the boundary of plaintiff's claim."

In Waterman Hall v. Waterman, 220 Ill. 569, 77 N.E. 142, 144, 4 L.R.A.,N.S., 776, the court said: "But counsel say that it was not color of title because it was a quitclaim deed. A warranty deed and a quitclaim deed both purport to accomplish the same thing, and have the same effect in transferring title. The covenants of a warranty deed do not pass the title, but create a liability, and a quitclaim deed which purports to convey the property is as good color of title as a warranty deed." And see 2 C.J.S., Adverse Possession, § 72, p. 603, where it is said: "A quitclaim deed is as effective as a warranty deed to confer color of title."

We think it well to remark that the concessions of appellants are accepted with caution. There is an Annotation in 3 A.L.R. 945 entitled: "Test of conveyance as quit claim or otherwise." It is there shown that a distinction is sometimes recognized by the courts as to characteristics of a deed which purports merely to convey the interest or title of the grantor as contrasted with one which conveys the property itself.

The deed in the case at bar belongs to the latter class and is color of title so far as the form of the instrument is concerned.

As we understand appellants' argument, it is, that although the deed in question is in form color of title, it is not in fact so, because the grantor did not in fact intend to convey and the grantee did not expect to acquire the whole of the property. Appellants say in their reply brief: "In the case before the court, appellee Thurmond acquired a one-half interest which was what Matilda Espalin owned in the property. She knew what she was conveying to him and he knew what he was acquiring from her, so from these facts, the transaction was one of good faith * * *. Under the pleadings and facts the quit claim deed could not be a color of title to the undivided interest of the other heirs and there being no color of title to said undivided interest shown under the New Mexico Statutes, title by adverse possession wholly failed."

Laying to one side the question of admissibility of evidence to impeach the deed

relied upon as color of title because not raised, we think the appellants are correct in their legal proposition. In 2 C.J.S., Adverse Possession, § 60, page 580, it is said of the effect of color of title: "The office of color of title is primarily to determine the character and extent of possession." And in a note on the same page is the following: " 'Color of title is anything which shows the extent of occupant's claim.' —Simmons v. Parsons, 20 S.C.L. 492, 495 [2 Hill 492, 495], quoted in Sprott v. Sprott, 110 S.C. 438, 114 S.C. 62, 96 S.E. 617, 619; and Thompson v. Brannon, 14 S.C. 542, 549."

Now, if the color of title may serve to limit the boundaries of plaintiff's claim, we see no reason why it may not also serve to limit or define the extent and nature of the claim with respect to the estate claimed. An illustration is given in 2 C.J.S., Adverse Possession, § 70, page 586, as follows:

"One may not secure by adverse possession a title or estate greater than that claimed.

"An essential element to an adverse holding which will ripen into title is that throughout the statutory period of possession the possessor must claim the character of title that he afterward asserts under his adverse holding, and, where only a life estate is claimed during the period of possession, one asserting title based upon such adverse possession may not secure the absolute or fee-simple title to the land."

If the deed in question had expressly conveyed only an undivided one-half interest, we think it could not be doubted that it were not color of title to the interest not conveyed. In Martinez v. Bruni, 235 S.W. 549, 551, the Commission of Appeals of Texas say: "It has been definitely decided in this state that a deed to an undivided interest will not, under the 5-year statute of limitation, protect the grantee beyond the interest it, on its face, purports to convey."

In the 2 C.J.S. article on Adverse Possession in § 61, it is asserted that color of title and claim of right are distinguishable saying: "Although 'color of title' and 'claim of title' are sometimes confounded and erroneously used as if synonymous in meaning, and may be legally equivalent where clearly made so under statute, they are ordinarily distinct and different in meaning, a claim under color of title being one made with a semblance of right or title and a claim of title being a claim to the land against the world irrespective of any foundation for such claim."

We find it unnecessary to engage in a discussion of the niceties of this suggested distinction since our Statute 1941 Comp. § 27-121 defines adverse possession to be "an actual and visible appropriation of land

commenced, and continued under color of title and claim of right inconsistent with and hostile to the claim of another;" etc. We do not hesitate to say that if the plaintiff's "claim of right" was to only an undivided one-half interest in the land here involved and he acknowledged the claim of others to an undivided half interest therein, such a claim was not "inconsistent with and hostile to the claim of" the defendants, and therefore such a claim would not support adverse possession of the entire estate in the lands unless the claim of others so recognized was repudiated and adverse possession was distinctly commenced and continued effectively against such erstwhile recognized claim.

Again consulting 2 C.J.S., Adverse Possession, we find in § 72, at page 591, the statement, "possession under a deed expressly made subject to another title or interest is not hostile thereto."

■ We assume in support of the judgment that when the trial court in its Findings of Fact heretofore quoted found that plaintiff had been in the "adverse possession" of the land, he used the expression as it is defined in the statute including the element of good faith. We do this the more readily because it appears in the record that good faith was an asserted issue.

It is arguable that the good faith required by our statute qualifies each of the elements of the statutory definition of adverse possession, but we find it unnecessary to go into that question at the present time. We are now concerned with what constitutes good faith by one who invokes Sec. 27-121, 1941 Comp., which requires broadly that adverse possession must be in good faith.

■ The question of what constitutes good faith is discussed in 2 C.J.S., Adverse Possession, § 170. Fortunately, in a case involving a Federal Statute of sufficient analogy to be useful, the trail has been blazed by our court to a considerable extent for correct understanding of the meaning of the phrase good faith. In Third Nat. Exch. Bank v. Smith, 20 N.M. 264, 148 P. 512, affirmed 244 U.S. 184, 37 S.Ct. 516, 61 L.Ed. 1071, it was decided: " 'Good faith,' in the creation or acquisition of color of title, is freedom from a design to defraud the person having the better title, and the knowledge of an adverse claim to or lien upon property does not, of itself, indicate bad faith in a purchaser, and is not even evidence of it, unless accompanied by some improper means to defeat such claim or lien."

Since the foregoing is based upon a quotation of Chief Justice Fuller in Searl v. School-Dist. No. 2, 133 U.S. 553, 10 S.Ct. 374, 33 L.Ed. 740, from an early Illinois decision (McCagg v. Heacock, 34 Ill. 476, 85 Am.Dec. 327), it is interesting to note that the courts of that state have

continued to adhere to that view as shown by the following taken from Vol. 18, Words and Phrases, Permanent Edition, "Good Faith".

"Adverse possession

"There is 'good faith' in claim of adverse possession where there is no fraud and color of title is not acquired in bad faith. Smith-Hurd Stats. c. 83, § 6; Dunlavy v. Lowrie, 372 Ill. 622, 25 N.E.2d 67, 71.

" 'Good faith' in acquiring title by adverse possession does not require ignorance of adverse claims or defect in title, and notice actual or constructive is immaterial. Smith-Hurd Stats. c. 83, § 6. Dunlavy v. Lowrie, 372 Ill. 622, 25 N.E.2d 67, 71."

And an early text Buswell on Limitations and Adverse Possession Sec. 259, page 360 says: "a claim made in good faith by color of title is not disparaged by the fact of the occupants' knowledge that the boundary lines of the granted premises are uncertain, and that the title is disputed."

Ballentine's Law Dictionary defines good faith in adverse possession as follows: "In the law of adverse possession, whether general or statute, the term means free from a design to defraud those who appear to have a better title than the claimant's. His possession must be free from stealth." Citing 1 R.C.L. 710.

In 2 C.J.S., Adverse Possession, § 170, discussing constructive notice as affecting good faith, it is said: "If no one could invoke successfully the prescription statute who could have discovered by an examination of the public records before buying the property that the seller had no title, the plea would never be available because no one could invoke it except one having a valid title and having therefore no need for prescription." Land Development Co. v. Shulz, 169 La. 1, 124 So. 125, 127.

We think this is common sense even when applied to actual notice, at least to a substantial degree and this seems to have been the view of the Illinois Supreme Court in Dunlavy v. Lowrie [372 Ill. 622, 25 N.E.2d 71], heretofore cited from Words and Phrases where it was said that notice "actual or constructive" of adverse claims is immaterial.

With the foregoing principles in view, we proceed to an examination of the evidence to determine whether defendants are correct in their assertion that plaintiff did not in good faith claim more than an undivided one-half interest in the land.

A further rule to guide our consideration is that: "It is presumed that the color of title of one claiming by adverse possession was acquired in good faith, and that the parties so entered into and held possession. Bad faith is never

presumed." 2 C.J.S., Adverse Possession, § 219.

■■ Plaintiff had color of title fair on its face to the land described. So far as the deed relied upon as color of title is concerned it appears that the grantor, Matilda Espalin, did not purport to convey merely an undivided one-half interest in the property. She conveyed the entire premises. The deed was executed and acknowledged on April 5, 1929 and recorded the following day. According to a finding of the court, the plaintiff immediately entered into possession of the land. We think these facts make out a prima facie case for plaintiff. The following is found in 2 C.J.S., Adverse Possession, § 170, Note 72, p. 743: "But knowledge of a defect in title is not of itself inconsistent with a bona fide claim of right. Where a claimant puts a deed upon record and enters into possession, his possession is presumptively referable to his deed. In such case, in so far as good faith is essential to his claim of right, it is presumed in his favor.—Collins v. Reimers, 181 Iowa 1143, 165 N.W. 373, 1 A.L.R. 878—Hughes v. Wyatt, 146 Iowa 392, 125 N.W. 334—Severson v. Gremm, 124 Iowa 729, 100 N.W. 862.".

There is no evidence produced by defendants touching on the question of plaintiff's good faith. Defendants must rely upon the testimony of plaintiff alone to prove their contentions heretofore outlined. The defendants did not procure the testimony of their aunt, Matilda Espalin, the grantor, to substantiate the claim now made by defendants that she did not intend to convey more than an undivided one-half interest to plaintiff Thurmond and that Thurmond did not understand that he was acquiring more than an undivided one-half interest. It is true that one of the defendants testified that only a year before the trial she learned that her Aunt Matilda had moved away and that "nobody knows where she is." There was no testimony as to the extent of the search, if any, which was made for the missing Matilda. The plaintiff Thurmond testified on cross-examination by defendant's counsel that he knew Jose Espalin and his widow, Matilda Espalin, from whom he bought the land, but that he had not known her long; he did not remember how much he paid her for the land; the land was not worth as much when he bought it as it is now; he lived about one-fourth of a mile from the land involved on the opposite side of the river; at the time of the trial he was not actually living on the land; he did not make an examination of the records to find out about the title; he did not know at the time he bought the land from Matilda Espalin that there were heirs who might be possible claimants, but some time after he bought the land (between April 5 and April 13, 1929) he inquired around and found out that there were heirs; maybe and

probably, Matilda Espalin, the grantor, either showed him the deed she had to the land from her husband, Jose Espalin, or gave such deed to him, he could not say for sure whether he had seen it or not (this deed conveyed an undivided half interest in the land involved). The following question and answer appear:

"Q. You knew she had a deed from her husband, didn't you? A. I don't know that I did, or whether she got her right to convey through probate proceedings or what. I just took her deed and that gave me the right to use the land."

With respect to the affidavit relating to possible claims of interest in the property referred to earlier in this opinion, the following questions were asked and answers given:

"Q. Do you know any of the Defendants in this case, Mrs. Hall here or Frank Espalin and Mrs. Wolfe? A. I knew there were heirs; I didn't know who they were or where they were.

"Q. How did you get knowledge of their heirship? A. From an affidavit. I inquired around and asked and I am the one who filed that affidavit, I think, and I have often tried to check my memory and see what I had in mind."

■ Whatever the plaintiff had in mind in procuring and filing for record this affidavit, we cannot see in this action any element of stealth, or design to defraud possible claimants of their interest in the land. To the contrary, it seemed open and above board and would afford at least constructive notice to such claimants that something was going on which might affect their interest adversely. As we have seen from the authorities quoted "good faith" in acquiring title by adverse possession does not require ignorance of adverse claims or defects in title. There is nothing in this affidavit or its recording which indicates a disavowal by Thurmond of his claim of right or a recognition of the claim of anyone else.

Since the trial court by its findings and conclusions necessarily concluded that the evidence did not show an absence of good faith and it being our duty on review to entertain all reasonable presumptions in favor of the correctness of the trial court's findings, conclusions and decree, we do not find ground for reversal.

■ Furthermore, while the question of good faith was plainly an issue in the case, the only finding of fact requested by the defendants is the one quoted in the early part of this opinion. If this finding had been made by the court, it would not of itself indicate bad faith since mere knowledge of adverse claims is not enough for that purpose. In any event, the evidence falls far short of proving that Matilda Espalin did not intend by her deed

to convey more than an undivided one-half interest in the property described and that plaintiff knew that she did not so intend and knew that he did not by the negotiations acquire more than a one-half interest therein.

■ It is not difficult to infer that even if plaintiff did see a deed made to the grantor conveying to her only an undivided one-half interest in the property, he may have entertained an honest belief that since she conveyed to him the entire property she had some other source of title to the other half. The evidence does not disclose that the plaintiff had knowledge of any bad faith conduct of his predecessor, if in fact she acted in bad faith, and therefore bad faith of Matilda Espalin, if any existed, could not be imputed to him. See 2 C.J.S., Adverse Possession, § 169.

■ We may not, as have some courts, ignore the element of good faith in adverse possession cases, because of the great difficulty of judicial investigation into the hidden motives of the entry or possession and all questions of good faith respecting the same. But these difficulties suggest the propriety of the requirement that where one relying upon adverse possession has satisfied all the other elements of it, one who challenges the good faith of the occupant must clearly discharge the burden of overcoming the presumption of good faith which flows from the occupant's open, exclusive, continuous, uninterrupted, hostile possession with the payment of taxes for the statutory period.

■ That plaintiff was in possession, exercising dominion over the land is not seriously questioned—what defendants contend is that plaintiffs' possession was for them as well as himself and therefore not hostile to them. In this connection appellants advance the proposition that: "Matilda Espalin being a cotenant with appellants conveyed to appellee only her existing title as cotenant and appellee took possession of the property as cotenant with appellants." We cannot agree to this. The act of the grantor Matilda W. Espalin in assuming to convey to a stranger the entire title as if she owned it was a repudiation of the existing cotenancy. It has been held that the effect of such a conveyance is to terminate the cotenancy. Jones v. Siler, 129 Tex. 18, 100 S.W.2d 352, 354.

Matilda W. Espalin did not convey an undivided one-half interest in the property, but, on the contrary, conveyed the entire premises. The acceptance of the deed by the grantee, his entry under it and his continued acts thereafter of ownership of, and dominion over, all of the land, were likewise hostile to the rights of appellants. The conveyance by Matilda W. Espalin of the entire estate in the entirety was decisive of her purpose to appropriate the entire estate to her own use, and entry by

Thurmond under the deed was equally evincive of his intention to claim the whole to the exclusion of the other cotenants of his grantor, if any, and upon the recording of the deed, the disseisin became complete.

According to the opinion in Jones v. Siler, supra, upon which we have drawn heavily in the foregoing statement of controlling principles, since it is a well-reasoned opinion decided upon facts quite similar to those in the case at bar, and even more favorable to similar contentions there urged, Thurmond's possession and the recording of the deed delivered to him, gave appellants constructive notice of the hostile character of his claim. The Commission of Appeals of Texas reasoned: "Siler's possession and the recording of the deed, taken together, gave defendants in error constructive notice of the hostile character of his claim (citing cases). The recording of the deed, without possession by the grantee, would not have given notice. This because of the general rule that one is not charged with notice by the registration of an instrument which is not in his chain of title. (Citation). But possession is equivalent to registration, in that it gives constructive notice of the possessor's rights. (Citation). Siler's possession pointed to the records for the information contained in his deed as to the source, nature, and extent of his claim. The func-

tion of the recorded deed here, to aid and explain the notice given by possession, is the same as that of the recorded deed in the ordinary case where title is claimed under the five-year statute of limitations. (Citations)."

In making use of the foregoing quotation, we do not mean to express an opinion as to whether under our registration laws, the recording of a deed has the limited effect stated in the Texas case. We say that our registration laws are at least as potent as claimed for the Texas Statute as construed. For further authorities in support of the view we take, see 2 C.J.S., Adverse Possession, § 72, p. 601, where it is said: "Where one tenant in common executes a deed purporting to convey the entire premises to a third person, who enters into possession under a claim of title to the whole, this will constitute a disseizin of the cotenants and after expiration of the statutory period, will bar the right of such cotenants to recover."

And see particularly Su Lee v. Peck, 49 Nev. 124, 240 P. 435, cited to the text where numerous authorities are assembled. And see also Pickens v. Stout, 67 W.Va. 422, 68 S.E. 354, where the proposition was discussed and the court had this to say on the question of notice: "Every owner is deemed to be cognizant of what is done upon his land and of who is in possession of it. The law exacts this measure of dil-

igence from him. He must know whether strangers are entering upon it, and, knowing that, must inquire by what right they do so. In every instance, such inquiry will presumptively lead to discovery of the hostile claim. Hence, the owner is bound to know, and is estopped from denying, all information to which such inquiry, prosecuted with reasonable diligence, would have led."

And Mr. Justice Brannon, concurring in the decision, made the following pertinent comments: "As long as a co-tenant continues in possession, giving no notice of adverse claim, his possession is for all; but, where he conveys the whole to a stranger, this itself is a disloyal act, in itself repudiates his fellow's right; and added to this there is a stranger in physical possession, and the co-tenant must take notice that a stranger is in possession, and his co-tenant gone, and he has no right to presume that a stranger is holding in friendship to him. Possession is notice. The party must inquire as to his right. * . * * The claim that the deed or contract is not itself notice, but there must be evidence of knowledge brought home to the ousted co-tenant, is not sound. The deed or contract, with possession makes notice."

We have studiously considered the briefs of counsel and have read the record with care and we do not find error in the judg-ment. It will therefore be affirmed. It is so ordered.

SADLER, C. J., and LUJAN, BRICE, and HUDSPETH, JJ., concur.