176 P.2d 909

**VELASQUEZ et ux. v. COX.**

No. 4982.

Supreme Court of New Mexico.

Dec. 23, 1946.

Rehearing Denied Feb. 11, 1947.

Charles B. Barker, of Santa Fe, for appellants.

A. T. Hannett, of Albuquerque, for appellee.

HUDSPETH, Justice.

This is an action brought against Dee W. Cox, hereinafter called the defendant, by the plaintiffs to recover a certain described tract of real estate containing about 40 acres in Section 13, Township 30 North, Range 8 West, N.M.P.M., in San Juan County. The issues were made up by

the defendant's amended answer to the complaint, a cross-complaint and plaintiffs' reply. The case was tried by the court, without a jury, and the defendant recovered judgment, from which an appeal had been taken to this court.

The court found that the plaintiffs were the owners of the W½ of the NE¼, and the NW¼ of the SE¼, Sec. 13, Twp. 30 N., R. 8 W., N.M.P.M., and that the defendant was the owner of the N½ of the NW¼, SE¼ of the NW¼, and NE¼ of the SW¼ of the same sections; that the defendant's land was granted by the United States of America by patent under the homestead law to Felipe Santiago Martinez in the year 1884, and that he immediately erected a fence as the true boundary to the easterly side of the said land, and that said land has ever since been occupied by the defendant and his predecessors in interest in open, notorious and undisputed possession, paying taxes thereon and claiming the same under color of title, up to and until the year 1933; that during the year 1933 the plaintiffs made claim that the fence maintained by the defendant and his predecessors in interest on the easterly boundary between the property of the plaintiffs and defendant was not upon the true boundary line between their lands, and enclosed part of the formers' land, approximately the land in controversy.

Plaintiffs' lands were patented to homesteaders in the years 1908 and 1922, and plaintiffs acquired these tracts in the year 1931.

Simon Velasquez, one of the plaintiffs, testified that he was 55 years old, that he was born near the land in controversy, that about 22 acres of it was good farming land under irrigation, and that it had been farmed by defendant and his predecessors in title as long as he could remember, and that he was the first one to question their title. It was stipulated that grazing land was valued for taxation purposes in San Juan County at $1 per acre, and there is uncontradicted testimony to the effect that the 22 acres of irrigated land in controversy, on which there is an old orchard, is about two-thirds of all the irrigated area on the Martinez homestead, now the farm of defendant.

Plaintiffs' engineer, James Harvey, testified that there were two surveys by the United States government of the east line of this Section 13, the original in the year 1880 and re-surveyed in the year 1913; that he used the re-survey notes along the east boundary and the old survey notes for the balance of the section; that the quarter-section corners on the north and south boundary lines of Section 13 were not found; that he found the original SW corner of Section 13 and established a quarter-section corner on the south boun-

dary line of Section 13, approximately one-half the distance from the SW cornerstone to the point indicated by the re-survey of the east boundary as the SE corner of Section 13 in the San Juan River; that he did not find the NW corner of Section 13, nor any corner within a distance of two miles running west from the point where the field notes indicated the NW corner of Section 13 was originally placed; that using the field notes of the original survey he established a quarter-section corner on the north line of Section 13, starting from the NE corner as located by the re-survey (the corner set in 1913) of Section 13; that he then marked the median line dividing Section 13 into east and west halves, as set out in plaintiffs' complaint. He testified further (cross-examination):

"Q. Now, I will ask you to look, Mr. Harvey, at a map. I think perhaps for the Court's convenience we had better get the map on the Court's desk. I am asking you to look at Defendant's Exhibit 2, annexed to the deposition of Thomas McClure, and numbered Defendant's Exhibit 2, in Mr. McClure's testimony, and which is an official record and map made by the State Engineer's Office for the adjudication suit touching the ownership of water rights on the San Juan River, and point out to you the area which appears on Section 13, and which bears the words Rex Smith, that's the same land that is now owned by Mr. Dee Cox, the defendant in this suit, is it not? That is from the red line towards the words Rex Smith, that is the subdivisions of land where Mr. Cox' land is located? A. I believe that's right.

"Q. Point out on this map the center of the Section 13. A. It is indicated as being at that point there.

"Q. Which is the red line purporting to follow the center line of Section 13, or approximately? A. Yes, I believe this is the ditch I located as the center line.

"Q. The ditch which is marked Martinez Ditch, is that correct? A. Yes, that's where I located it. * * *

(Re-Direct Examination)

"Q. Looking at this map identified as Defendant's Exhibit 2, which shows by a red line the Cox fence, as coinciding very nearly with the center line dividing Section 13 into its east and west halves, I will ask you to state whether that correctly shows the location of the fence? A. It certainly does not show it correctly, if you take half mile west from the northeast corner of Section 13. * * *

(Re-Cross-Examination)

"* * * In other words, between the northeast corner of Section 13 and the North quarter corner of Section 14, there is a north-south discrepancy of about 680 feet and an east-west discrepancy of about 640 feet, between the official plat distance and the official ground distance? A. I

have never run across such large discrepancies in my work.

"Q. Do you know whether that exists here? A. I didn't find the corner, if I found that at such location I would assume the corner had been moved.

"Q. Isn't it true, unless and until the original survey stones at the northeast corner and the north quarter corner of 13 are found, there is no way of knowing how or where this error was distributed between the two points, that's true, isn't it? A. That may be. Which error are you referring to?

"Q. The one I just— A. That 600 feet?

"Q. Yes. A. I don't concede there is such an error. I think if there is a stone that far off it has been moved. I found the southwest corner of 13 quite off from what the notes called for.

"Q. As a matter of fact, if you move— if the State Engineer's map which was filed in this adjudication suit is 700 feet off, or the distance you have given, approximately 700 feet off, then it would affect the title to every piece of land in that township and move it 700 feet in some direction, wouldn't it? A. I found that the lines in that township are very poorly located and marked from the fact that the corners are not in place through either not having been

set originally or moved, but I believe not having been set originally."

And testified also:

"* * * Q. Isn't it true it was originally surveyed, and original field notes and original plat of Township 30 North, Range 8 West, N.M.P.M. was made and filed in the land office on April 19, 1881? A. I don't remember the dates. I think the exteriors were run separate from the subdivisions."

Mr. Harvey's plat shows that according to the re-survey of the east boundary the northeast corner of Section 13 is several hundred feet (the exact distance is not shown) south of the corner common to Section 7 and Section 18 in the township to the east; while the field notes of the original survey (year 1880) read: "80.00— Set sandstone 18 x 16 x 8⅔ in ground marked 2 notches on N and .4 on S sides and mound of sandstone for cor. to Secs. 7, 12, 13 and 18 * * *."

Defendant's Exhibit 2 is a map on file in the office of the State Engineer of a hydrographic survey made under the direction of the State Engineer in an adjudication suit concerning the waters of the San Juan River and its tributaries filed in the District Court of San Juan County. The survey was made in the year 1938 and covers a large area including the part of the land in Section 13, which was being served with

water at that time, and portrays the amount and shows the boundaries of the lands owned by each of the owners at that time, according to the testimony of the State Engineer. He said it was the general practice of his office in making such surveys to attempt to locate every corner and get a land net located accurately. An assistant to the State Engineer testified regarding the map as follows:

"Court: Which maps are you referring to? A. I am referring to the Hydraulic Survey, Defendant's Exhibit 2, and all corners which are indicated by a diamond, as I say, were found in the field, and the map and the original field sheets indicate that the quarter corners common to Section 10 and 15 and common to 11 and 14 were both found in the field and have been located on the map. * * *

"Q. In other words, between the northeast corner of Section 13 and the north quarter corner of Section 14, there is a north-south discrepancy of about 680 feet, and an east-west discrepancy of about 640 feet, between the plat and ground distances? A. I found that to be so.

"Q. By official plat, you mean United States Government? A. That's right, the official distances, as shown on the 1880 survey.

"Q. Now, as a matter of fact, state whether or not that unless and until the original survey stones at the northwest cor- ner, or the north quarter corner of Section 13 are found that there is no way of knowing where this error was distributed between the two points? A. I would say that is correct. If there is an approximate north-south error of about one-eighth mile, and an east-west error about the same in that mile and a half, I, myself, wouldn't know how to relocate it, and it seems to me if the corner were not found it would be almost impossible to say where the north quarter corner, say of Section 13, would be, because there is one-eighth of a mile error there which has to be distributed equally in that mile and a half, or the error would have to be resolved by finding the corners originally placed.

"Q. Now, this means, that if the entire 690 feet east-west error occurred in measuring the east half of Section 13, the north end of the Cox fence would be very nearly on the section line? A. That's what our survey shows. In other words, if you go just a full mile westerly (easterly) from the north quarter corner, or the quarter corner common to Sections 11 and 14, and then due south, you will arrive directly on the Cox fence. * * *

(Cross-Examination)

"Q. You admit then, that the center line of Section 13 as shown on this map is incorrectly shown? A. I won't say that because neither the north nor the south quarter corner of Section 13 have been

found. They have been re-established by Mr. Harvey according to usual land office procedure, but with the large error, both north and south and east and west which is indicated in· that last mile and a half, I wouldn't care to say that his survey was any more accurate than ours. I don't think anyone knows where the original location is."

It appears that the main question in this case is as to the true location on the ground of the line between the quarter-section corner on the north boundary of Section 13 and the quarter-section corner on the south boundary of said section. The first step is to determine, if possible, where the quarter-section corner stones were set by the United States Deputy Surveyor in the year 1880.

The foregoing excerpts from the testimony of the expert witnesses indicate the different theories as to the surveys. Plaintiffs' attorney, while admitting that defendant's Exhibit 2 was admissible as a public record (N.M.S.A. 1941, 19-101(44); 11 C. J.S., Boundaries § 111, p. 707), strenuously maintains that Mr. Harvey, plaintiffs' engineer was the only competent witness to testify as· to the location of corners of the public surveys; and that he located the median line dividing Sec. 13 into east and west halves in accordance with Circular 1452 United States Department of the Interior General Land Office, "Restoration of Lost or Obliterated Corners and Subdivi-

sion of Sections." Cordell v. Sanders, 331 Mo. 84, 52 S.W.2d 834, 838.

The circular 1452, supra, states general rules about which there is no dispute, which we quote:

"First. That the boundaries of the public lands, when approved and accepted, are unchangeable.

"Second. That the original township, section, and quarter-section corners must stand as the true corners which they were intended to represent, whether in the place shown by the field notes or not.

"Fourth. That the center lines of a section are to be straight, running from the quarter-section corner on one boundary to the corresponding corner on the opposite boundary.

"Sixth. That lost or obliterated corners are to be restored to their original locations whenever it is possible to do so."

On the other hand, defendant insists that the quarter-section corners are to be restored to their original locations regardless of the distance or direction from the re-established corners on the east line of Section 13. Defendant insists that there is substantial evidence to support his theory that the obliterated quarter-section corners on the north and south lines of Section 13 were originally located as indicated by the map of the hydrographic survey made in the year 1938, (Defendant's Exhibit 2),

which plaintiffs' attorney admits corresponds approximately with the east boundary fence of defendant and defendant points out that the quarter-section corner on the north boundary of Section 13 harmonizes with the quarter-section corners on the north boundaries of the two sections to the west of Section 13 in which there are irrigated fields belonging to other parties. He dwells upon the facts that 60 years have elapsed since the patent to the defendant's land was issued by the United States to the homesteader, Martinez, and the fence in question was built by him; that 49 years elapsed before the location of the boundary fence was questioned; that Martinez, the homesteader, was required under the homestead law to reside five years on his homestead, and that was his place of residence in the year 1880 when the township was surveyed; that it is probable that he knew where the quarter-section corners on the north and south boundaries of Section 13 were placed by the U. S. Deputy Surveyor in 1880, the north quarter-section corner being a corner of his land, and that he built his east boundary fence line in conformity therewith; that he planted an orchard and made other valuable improvements on the disputed strip. Plaintiffs' land being public domain at that time, Martinez had the choice of entering those subdivisions on which the plaintiffs now claim two-thirds of the irrigated land on the Martinez homestead—defendant's farm—are located.

The non-irrigated lands are of small value —taxed on a valuation of $1 per acre.

Plaintiffs' witness and engineer, Harvey, expressed the belief that corners within the Township 30 N., R. 8 W., were never set. In other words, the land lines were never run, nor stones placed for the corners by the United States Deputy Surveyor, and that the field notes, which were accepted and approved by the government were fictitious, or what is sometimes called an "office survey." He testified that he found one original corner, the southwest corner of Section 13. Defendant claims that quarter-section corners on the north boundaries of Sections 14 and 15 were found, but Mr. Harvey states that he had never run across such large discrepancies as indicated by the hydrographic map. There are such discrepancies in the public surveys. Canavan v. Dugan, etc., 10 N.M. 316, 62 P. 971, 11 C.J.S. Sec. 51, Boundaries, pp. 612-615.

In the case of Byrne v. McKeachie, 34 S.D. 589, 149 N.W. 552, 553, the court said: "No matter how erroneously the work of the government surveyor may have been done, and no matter how far out of its proper location a government corner may have been established, if such location can be fixed it must control. Hoekman v. Iowa Civil Twp., 28 S.D. 206, 132 N.W. 1004."

And in this same case is quoted from the earlier case of Wentzel v. Claussen,

26 S.D. 89, 127 N.W. 621, 622, as follows: "Where people for 20 or more years have recognized lines as the true boundaries throughout a whole township, there must be most satisfactory proof that the government corners have become absolutely 'lost,' as distinguished from 'obliterated,' before it will be allowed the township authorities or private parties to institute a new survey and locate corners throughout a township at points clearly not where the original corners were located."

In the case of Bentley, et al. v. Jenne, 33 Wyo. 1, 236 P. 509, 513, the court made reference to what is termed an independent survey made by the government by which the township was platted into a number of lots. The homesteads that had been patented were given lot numbers, and the court said: "Counsel for appellant have devoted a great deal of their argument to this subject, but we fail to see the importance thereof. We concede that a resurvey cannot disturb the title which parties have acquired up to the time that it is made. We do not, however, understand that respondents claim any rights under any new survey. The only purpose, apparently, of introducing any evidence in regard thereto was to settle all future questions as to the actual location and description of the Hamilton land, and to locate and describe it in accordance with the new survey."

In Circular No. 1452 of the Department of the Interior, supra, it is stated:

"1006. The act of Congress approved September 21, 1918, entitled 'An act authorizing the resurvey or retracement of lands heretofore returned as surveyed public lands of the United States under certain conditions' provides authority for the resurvey by the Government of townships theretofore held to be ineligible for resurvey by reason of the disposals being in excess of fifty per centum of the total area thereof. * * * *

"1011 * * * The independent resurvey is one which makes a new subdivision and new lottings of the vacant public lands, which are designed to supersede the original survey. Provision is made for the segregation of individual tracts of privately-owned lands, entries, or claims that may be based upon the original plat, when necessary for their protection, or for their conformation to the regular subdivisions of the resurvey if that may be feasible, or for an amendment of the entry or patent after an adjudication of the rights that may be involved."

These independent surveys, where they do not conform to original lines and corners, are not binding on owners of patented lands, but often enable men of good will to avoid expensive litigation by accepting the good offices of the federal officials in charge of the resurvey of public lands.

It is stipulated that the lands of plaintiffs were patented in the year 1908 and 1922 to homesteaders. These parties and their successors in interest lived on these homesteads and farmed up to the fence line in question for more than 10 years before they sold to the plaintiffs, and the plaintiffs after they discovered what they thought was the error in the original survey or location of the fence line waited 11 years before filing this suit.

There are arguments in the briefs on acquiescence and adverse possession. We have lately discussed these subjects in the cases of Thurmond v. Espalin, 50 N.M. 109, 171 P.2d 325; Lovelace v. Hightower, 50 N.M. 50, 168 P.2d 864; Christmas v. Cowden, 44 N.M. 517, 105 P.2d 484; Rodriguez v. La Cueva Ranch Co., 17 N.M. 246, 134 P. 228; Ward v. Rodriguez, 43 N.M. 191, 88 P.2d 277, 279.

In Ward v. Rodriguez we said: "We recognize the rule to be that the government has the right to re-survey public land, as corrective and as a retracing, but such survey will be construed to have and follow the lines of the original U. S. survey where it would affect bona fide private rights held under such original survey. U.S.C.A. Tit. 43, § 772; Cragin v. Powell, 128 U.S. 691, 9 S.Ct. 203, 32 L.Ed. 566; Lane v. Darlington, 249 U.S. 331, 39 S.Ct. 299, 63 L.Ed. 629."

In other words, what we were attempting to make plain was that no resurvey by the government can change the lines of the original survey to the prejudice of private rights acquired in good faith in reliance on the integrity of the original survey.

But we rest our conclusion herein on the evidence as to the true location on the ground of the dividing line between the lands of the plaintiffs and defendant. Before the trial court could consider the accuracy of the work of plaintiffs' engineer, he was called upon to determine, if possible, where the original quarter-section corners on the north and south boundaries of Section 13 were actually established by the government survey in the year 1880. Twitchell's Leading Facts of New Mexican History says that the irrigation of the lands in San Juan County was commenced about the year 1877. It is probable that there were settlers in Twp. 30 N., R. 8 W., in 1880, and that the Deputy U. S. Surveyor established some corners in the settlements, although the belief of the witness Harvey that it was in the main an "office survey" may be true. The map of the hydrographic survey, defendant's Exhibit 2, is some evidence that the dividing line claimed by defendant as evidenced by his fence harmonizes with the lines recognized by the landowners of irrigated lands in the two sections immediately west of Section 13.

Moreover, the conditions prevailing at the time Martinez entered as a homestead the lands now owned by defendant, and the long recognition of the fence as the east boundary of this homestead, are evidence that the old fence was built on the true line. On this subject, Circuit Judge Sanborn in the case of State of Iowa v. Carr, 191 F. 257, 263, 112 C.C.A. 477, said:

"Moreover, the arguments and the briefs leave no doubt that a very large proportion, if not all, of the land in controversy is outside of the abandoned river channel, and this fact reduces the issue here to a mere question of the correctness of the boundary lines of the complainants' property, according to which they have held undisputed possession, paid taxes and made costly improvements claiming title with the silent acquiescence of the state for more than 20 years, and brings this portion of the case under the reasonable and salutary rule of evidence that such facts constitute strong proof of the accuracy of the boundary lines, a rule which prevails in the state of Iowa and is stated by its Supreme Court in these words:

" 'Without any reference to the doctrine of title by adverse possession, the fact that a party owning a tract of land has for many years occupied and claimed up to a particular line as the true boundary, and the owner of the adjoining tract has silently acquiesced therein, is a circumstance strongly tending to show the correctness of the claim; and in the absence of other controlling circumstances the line so indicated should be taken as the true division between the respective premises.'

"Corey v. City of Fort Dodge, 118 Iowa 743, 747, 92 N.W. 704, 705 and cases there cited. In view of these facts, of this rule of law and of the evidence of title which the long-continued possession in accordance with these boundary lines produced, the burden was thrown upon the state in the court below to show where, in what respect and to what extent, if at all, these boundary lines were incorrect, and where the true lines were between the plaintiffs' land and the state's part of the abandoned channel of the river. The court below considered all the evidence in the case upon this subject, found that the state had not successfully borne this burden, that the boundary lines in accordance with which the plaintiffs and their grantors had occupied and improved were the true boundary lines of their property and confirmed their title in accordance therewith."

In Magoon v. Davis, 84 Me. 178, 24 A. 809, 810, the court said: "The occupation and possession of the owners of lots by dividing fences erected soon after the establishment of the lines, when the location of the line may generally be better ascertained and understood than it can possibly be years afterwards, is entitled to great weight in

determining the question. And, in cases of doubt, we think the fact of the mutual occupation of the parties, the mutual recognition of the line as indicated by their occupation and dividing fences, should prevail over the uncertainty which arises in any attempt, by the running of lines so many years after the original survey, to establish the true line between the parties."

See also Brown v. Derway, 109 Vt. 37, 192 A. 16; Romine v. West, 134 Neb. 274, 278 N.W. 490; Piquet v. Piquet et al., Okl. Sup., 165 P.2d 622; Vowinckel v. N. Clark & Sons, 217 Cal. 258, 18 P.2d 58; Roberts v. Brae et al., 5 Cal.2d 356, 54 P.2d 698; Meson v. Braught, 33 S.D. 559, 146 N.W. 687.

Where a boundary line lies on the ground is a question of fact (Sunmount Co. v. Bynner, 35 N.M. 527, 2 P.2d 311), and it is our duty on review to entertain all reasonable presumptions in favor of the correctness of the trial court's findings, conclusions and judgment. Thurmond v. Espalin et al., supra. The trial court considered all the evidence. and found, in effect, that the boundary line in conformity with which defendant and his predecessors in title had occupied and improved the land was the true boundary.

Finding no error in the record, the judgment of the District Court will be affirmed.

It is so ordered.

SADLER, C. J., and BICKLEY, BRICE, and LUJAN, JJ., concur.