557 P.2d 209

**S. J. SACHS, aka Simon J. Sachs, a married man, Plaintiff-Appellee,**

**v.**

**BOARD OF TRUSTEES OF the TOWN OF CEBOLLETA LAND GRANT et al., Defendants-Appellants.**

**KERR–McGEE CORPORATION et al., Plaintiffs-Appellees,**

**v.**

**BOKUM RESOURCES CORPORATION et al., Defendants-Appellants.**

**Nos. 10629, 10630.**

Supreme Court of New Mexico.

Nov. 16, 1976.

Rehearing Denied Dec. 30, 1976.

Bigbee, Stephenson, Carpenter & Crout, G. Stanley Crout, Santa Fe, Edward J. Apodaca, Albuquerque, for defendants-appellants.

Rodey, Dickason, Sloan, Akin & Robb, J. D. Robb, Albuquerque, Glascock, McKim & Head, Henry S. Glascock, Gallup, Willard P. Scott, George R. Cochran, Oklahoma City, Okl., for plaintiffs-appellees.

## OPINION

MONTOYA, Justice.

This cause consists of two cases, consolidated for appeal, which were tried in the District Court of McKinley County. They involve a dispute over the boundary between the mineral interest in certain property owned by plaintiffs-appellees (hereinafter plaintiffs or Kerr-McGee) and the mineral interest in adjoining property owned by defendants-appellants (hereinafter defendant or Bokum).

A brief history of the facts involved in this complicated appeal may aid in understanding the issues raised and arguments presented.

In 1905, the Cebolleta Land Grant was partitioned by judicial decree (*Baca v. Anaya,* 14 N.M. 20, 89 P. 314 (1907); 14 N.M. 382, 94 P. 1017 (1908) ) into a number of tracts with designated owners. S. J. Sachs, through whom plaintiffs derive their claim, and the Juan Tafoya Land Grant, formerly a part of the Cebolleta Grant, through whom defendants derive their claim, were two of the designated owners. It soon became apparent that an application of the calls and distances description set forth in the partition decree resulted in an "overlap" of 1600 feet between the boundaries of the Sachs tract and the Grant tract.

In 1949, Sachs brought a quiet title action in McKinley County to resolve the dispute as to the boundary. Title in the disputed area was quieted in Sachs, with the requirement that he deed part of the disputed area to the Grant "according to a survey made * * * by Walter G. Turley," a surveyor employed by the Grant.

The final decree entered in March 1951, provided for the conveyance describing the

property by both the calls and distances shown on the Turley map and by the additional language "all as shown on map of G. Turley, February 27, 1951  *   *   *."

The Turley map, reproduced below, shows the disputed area (the "arm") extending north and west from the main rectangular tract up the Marquez Canyon.

(Joint Ex. 7561-T Reduced, Words "Arm", "Rectangular Tract" and "Wedge added to illustrate areas)

After the quiet title suit was completed, Sachs sold his property to the McKenzies, who had a fence built around the "arm" in about 1953 to control the movement of the livestock grazing on the land, as testified to by a member of the McKenzie family. Some of the individual members or owners of the Grant were employed by one Riley Mays, the McKenzie's representative to assist in the construction of the fence. The fence is not on a line with the boundary established by the calls and distances of the Turley map.

For the next twenty years, the land in dispute was used solely for farming and grazing purposes, and the parties honored the fence as the boundary for those purposes.

In 1974, Bokum, the mineral lessee from the Grant, drilled exploratory holes in the "arm" for uranium. Shortly thereafter, Kerr-McGee, the mineral lessee from the successors to Sachs, also began exploratory drilling in the disputed area. For a short period of time, both parties also honored the fence as the boundary while conducting their exploration for uranium.

This exploratory drilling has established a minimum "in-place" value of the uranium reserves in the disputed area at the time of trial of $4,200,000. Consequently, the issue of whether the fence or the Turley survey's calls and distances establish the true boundary between the Sachs tract and the Grant tract has assumed an urgency and an economic significance unknown when the land was used only for grazing.

The following sketch shows the area of land which is really the difference of opinion beween the parties. The inner boundaries reflect the Turley survey, the outer lines reflect the fence line. The disputed area is indicated by the shaded lines. A portion of the fence on the north side is projected because of the rough terrain.

[See following illustration]

Overlay of Exhibits B-7561-7 and B-7561-10; arm area between fence line and judgment hatched; reduced in size "Kerr-McGee" and "Bokum" added for illustration.

Kerr-McGee, claiming that the true boundary in the "arm" was established by the calls and distances shown on the 1951 Turley map, rather than by the fence erected subsequently, filed suit in McKinley County in 1974, being cause No. 15361, against Bokum to obtain, first, a determination that they had the exclusive mineral rights in the disputed realty and, second, an injunction prohibiting Bokum from con-

ducting further exploration or otherwise interfering with Kerr-McGee's activities and, third, a quiet title to their interest in the disputed area.

Bokum counterclaimed contending that the fence was the true boundary (because monuments control over calls and distances and in any event because the parties had acquiesced in the fence as the boundary) and seeking a determination that Bokum had the exclusive mineral rights in the property.

After trial to the court without a jury, the court concluded that the honoring of the fence line as the boundary for surface purposes was not binding as the boundary for mineral purposes. Judgment was entered for Kerr-McGee and Bokum appeals. This will be referred to as the Kerr-Mc-Gee suit.

Also in 1974, certain of the defendants, including Bokum, in the Kerr-McGee suit, filed a motion in McKinley County to set aside the judgment and decree entered in the 1951 Sachs quiet title action, contending that the boundary should be moved west about 1600 feet and that the calls and distances used in the map were contrary to the map itself. The trial court denied the motion to set aside the judgment, and the "Bokum group" appeals. This will be referred to as the Sachs suit.

The appeal of the order denying the motion to set aside the judgment in the quiet title suit seeks to attack the order "only to the extent that the effect of such order, and the judgment the motion sought to set aside, is to prejudice the contentions of defendants" in the Kerr-McGee suit.

The main issue raised by the parties is whether the honoring of the fence line as the boundary for surface purposes is a binding determination of the ownership of the mineral interests of the parties. The basic question to be determined is whether the parties have acquiesced in the fence built by the Sachs' successors in interest as the boundary so as to preclude the assertion of another boundary.

A second issue presented by the appeal, although not raised by the parties, is whether the attempted partial appeal of the Sachs' suit will lie under these circumstances—whether, as Bokum implicitly claims, they may appeal the denial of the motion to set aside the quiet title judgment "only to the extent that" the denial prejudices their claim in the Kerr-McGee suit.

■ Certain well defined principles of law pronounced by this court will assist in the determination of the issues in this case. It is well established in the law of this State and generally that if adjoining landowners occupy their respective tracts up to a clear and certain line (such as a fence), which they mutually recognize and accept as the dividing line between their properties for a long period of time, neither may thereafter claim that the boundary thus recognized is not the true boundary.

The leading New Mexico case is *Woodburn v. Grimes,* 58 N.M. 717, 720–721, 275 P.2d 850, 852 (1954), where this court stated:

"* * *. Unquestionably, where uncertainty or dispute exists in this regard, a boundary line may be established by acquiescence. *Rodriguez v. La Cueva Ranch Co.,* 17 N.M. 246, 134 P. 228; *Murray Hotel Co. v. Golding* [54 N.M. 149, 216 P.2d 364 (1950) ]. But these elements are not essential in every case. A boundary line may be established by acquiescence where there has been long recognition by abutting owners. *Velasquez v. Cox,* supra [50 N.M. 338, 176 P. 2d 909, 914]. In the latter case we quoted approvingly from the case of *State of Iowa v. Carr,* 8 Cir., 191 F. 257, 112 C.C.A. 477, and it would not be out of place to repeat a part of what was there said.

"' "Without any reference to the doctrine of title by adverse possession, the fact that a party owning a tract of land has for many years occupied and claimed up to a particular line as the true boundary, and the owner of

the adjoining tract has silently acquiesced therein, is a circumstance strongly tending to show the correctness of the claim; and in the absence of other controlling circumstances the line so indicated should be taken as the true division between the respective premises.' "

\* \* \* \* \* \*

"In *Magoon v. Davis,* 84 Me. 178, 24 A. 809, 810, the court said: 'The occupation and possession of the owners of lots by dividing fences erected soon after the establishment of the lines, when the location of the line may generally be better ascertained and understood than it can possibly be years afterwards, is entitled to great weight in determining the question. And, in cases of doubt, we think the fact of the mutual occupation of the parties, the mutual recognition of the line as indicated by their occupation and dividing fences, should prevail over the uncertainty which arises in any attempt, by the running of lines so many years after the original survey, to establish the true line between the parties.' "

The rule set forth above is controlling here. The trial court specifically found in its finding No. 6 as follows:

"The McKenzies and subsequent owners and users of the property which had been determined in the 1951 quiet title suit to belong to Sachs, from its construction in 1953, honored the fence line as a boundary between that property and the Juan Tafoya land grant and the residents of the Juan Tafoya Grant did likewise insofar as the use of the surface for grazing of cattle."

This finding is the major area of contention in this appeal. Bokum claims that the finding of honoring the fence as the boundary for grazing purposes required the conclusion that the parties acquiesced in the fence as the boundary for mineral purposes; Kerr-McGee, on the other hand, contends that "honoring" is not a sufficient recognition to compel a finding of acquiescence, and that in any event, any

boundary so established for surface purposes such as grazing is not binding as a boundary for other purposes, particularly subsurface ones such as mining.

Other findings made by the trial court which are pertinent are:

"5. The McKenzie fence was not placed as a result of a survey but was done to follow a route of convenience in an alignment that would be located outside the Turley survey lines to avoid any possible encroachment on the land of the Juan Tafoya Grant.

"6. [Quoted above.]

"7. The successors to the Sachs in the property dealt with the land in all other ways in matters of record such as payment of taxes, conveyances of minerals [sic] interests and the like as if the boundary were the Turley survey line.

"8. The Juan Tafoya Land Grant officers as well as individual owners within the land grant area, and these defendants dealt with the land in matters of record such as payment of taxes, conveyances of mineral interests and the like as if the boundary were the McKenzie fence line."

The trial court's conclusions were in accord with Kerr-McGee's contentions on appeal. Despite its finding that the parties had long honored the fence as the boundary line for the only purpose for which the land was put, namely the grazing of cattle, the court concluded as a matter of law that "the correct boundary is the Turley survey line," and that the fence was not binding as a boundary for mineral purposes.

It is a basic rule in New Mexico that where a conclusion conflicts with, or does not follow, a finding of fact, the finding of fact controls and the appellate court will apply the proper conclusion of law. *In re Will of Carson,* 87 N.M. 43, 529 P.2d 269 (1974); *Woodson v. Raynolds,* 42 N. M. 161, 76 P.2d 34 (1938). Here, the finding that the parties honored the fence for grazing purposes compelled the conclusion under the doctrine of acquiescence, that

the fence line was binding on the parties as the boundary for mineral purposes as well. Since the trial court's conclusion to the contrary was in conflict with and not supported by its own finding, the decision of the trial court must be reversed.

The conflict between the finding of honoring the fence as a boundary for grazing purposes and the conclusion that no title was acquired by acquiescence may be delineated as follows.

In the first place, Kerr-McGee claims that to honor a fence as a boundary is not to "recognize" it so as to support a finding of acquiescence. This argument has no merit.

It is difficult to understand the argument that one can "honor" a fence without acknowledging it to be the boundary. For what other reason does one honor a fence? Furthermore, the plain meaning of the words precludes Kerr-McGee's argument. According to Webster's New International Dictionary of the English Language (2d ed. 1960), to "acquiesce" in something is to accept or comply tacitly or passively, without implying assent or agreement; "acquiescence" is distinguished from avowed consent on the one hand, and, on the other, from opposition or open discontent. To "honor" a thing is, on the other hand, far less passive a form of recognition than acquiescence. To honor is to treat with respect, to show respect for a thing by rendering due obedience and courtesy. It follows, therefore, that to honor a fence as a boundary is *a fortiori* to acquiesce in the fence as a boundary. To the extent that the meanings of the two words are distinct, "honor" is more—not less—forceful and affirmative than "acquiescence." See *Travelers Insurance Co. v. McCluskey*, 252 Ark. 1045, 1052, 483 S.W. 2d 179, 184, where the court stated:

" * * *. We understand the verb 'honor' in the context in which it is used to be synonymous with the words esteem, respect and recognize. See Webster's New International Dictionary, Second and Third Editions."

Kerr-McGee further argues (albeit in a footnote) that even if acquiescence had been found, it would not extend below the surface to the minerals, that the fence at most constituted a boundary for grazing purposes only. This argument is equally without merit. The whole reason for the acquiescence doctrine is the desirability of a rule of repose, of quieting title and preserving the peace and good order of society. *Hobson v. Panguitch Lake Corporation*, 530 P.2d 792 (Utah 1975). If adjoining landowners could recognize a fence as the boundary for grazing purposes but maintain, one against the other, that a river was the dividing line for irrigation purposes, or that one metes and bounds description defined the boundary for purposes of commercial development, etc., it is clear that the reason for the existence of the doctrine would be completely frustrated. Common sense and reason require that, if adjoining landowners acquiesce in a fence as a boundary for all of the purposes to which a property was placed during the period involved, as a matter of law the doctrine of acquiescence applies to make that fence the boundary for subsequent uses of the property.

There is of course no requirement of a showing that the parties "intended" the fence to mark the boundary between their properties. It is the recognition of the fence that makes it the boundary, not any express or implied agreement that it mark the dividing line. *Woodburn v. Grimes*, supra. See also *Lane v. Walker*, 29 Utah 2d 119, 120, 505 P.2d 1199, 1200 (1973), where the Supreme Court of Utah said:

"Plaintiffs urge that there is no evidence to indulge a fiction that there was a fence mutually 'intended' to be a boundary. To this we say that the test to establish the boundary by 'acquiescence' necessarily need not be based on mutual 'intent.' 'Intent' is not synonymous with 'acquiescence' in these cases.

720

'Acquiescence' is more nearly synonymous with 'indolence,' or 'consent by silence,'—or a knowledge that a fence or other monuments appears to be a boundary,—but that no one did anything about it for 48 years. No one in this case did much except by invective, across the very fence that made irritants out of erstwhile neighbors, for 48 years,—until suddenly the appreciation of property values transmuted yesteryear's minimal values into objects d'art of inestimable value in the real estate market."

Similarly, none of the parties to this action made any objection to the fence as the boundary from the time of its construction until the discovery of uranium more than twenty years later. As the trial judge orally ruled immediately after the trial,

"And the parties lived with it [fence line] for all those years until you folks [Kerr-McGee and Bokum] got into the act, and I think you uranium folks are going to have to take them like you found them. I think the fence line is the acquiescence line. * * * I think the fence line is the line."

The parties to this controversy have for many years occupied their respective properties up to the McKenzie fence line. Bokum has, as the trial court specifically found, "dealt with the land in matters of record such as payment of taxes, conveyances of mineral interests and the like as if the boundary were the McKenzie fence line" and Kerr-McGee for years made no objection to the fence as the boundary. Therefore, according to the rule enunciated in *State of Iowa v. Carr*, 191 F. 257 (8th Cir. 1911), adopted by this court in *Velasquez v. Cox*, 50 N.M. 338, 176 P.2d 909 (1946), and thereafter approved in *Woodburn v. Grimes*, supra, and succeeding cases, "in the absence of other controlling circumstances the line so indicated should be taken as the true division between the respective premises." *State of Iowa v. Carr*, supra at 263 (citing *Corey v. City of Fort Dodge*, 118 Iowa 742, 747, 92 N.W. 704, 705 (1902)).

We cannot agree with Kerr-McGee here that the "other circumstances" are controlling. So long as Kerr-McGee did not contest the location of the fence line for the period necessary to establish the fence as the boundary, it is immaterial that they used the Turley survey line as the boundary for tax purposes. See *McBride v. Allison*, 78 N.M. 84, 85, 428 P.2d 623, 624 (1967), where the court found that the defendant's predecessor in title—

"* * * neither did nor said anything about the fence while he owned the property. Thus, the defendant's predecessors in title had either acquiesced in the location of the boundary fence, or had actively confirmed its location. * * *"

So here, since it was not until the value of the property increased dramatically upon the discovery of uranium that Kerr-McGee even suggested that the fence was not the boundary, or that the fence did not accurately track the Turley survey on the ground, they are precluded from asserting a boundary other than that established by the fence.

Having decided that the doctrine of acquiescence is applicable in this case, the next question presented is whether the boundary so established is binding for all purposes—whether, as Bokum urges, the mineral rights pass with the estate.

Although there is no New Mexico case directly in point, none of the New Mexico Supreme Court cases on acquiescence limit the application of the doctrine to that use of the property which existed when the acquiescence occurred. See *Sanchez v. Scott*, 85 N.M. 695, 516 P.2d 666 (1973); *Gilman v. Powers*, 83 N.M. 80, 488 P.2d 337 (1971); *McBride v. Allison*, supra; *Thomas v. Pigman*, 77 N.M. 521, 424 P.2d 799 (1967); *Sproles v. McDonald*, 70 N.M. 168, 372 P.2d 122 (1962); *Hobson v. Miller*, 64 N.M. 215, 326 P.2d 1095 (1958); *Woodburn v. Grimes*, supra; *Murray Hotel Co. v. Golding*, 54 N.M. 149, 216 P.2d 364 (1950); *Velasquez v. Cox*, supra;

*Rodriguez v. Ranch Co.*, 17 N.M. 246, 134 P. 228 (1912). Furthermore, as previously discussed, it is neither logical nor reasonable to maintain that there could be different boundaries between the same tracts of land for different "purposes" to which the land might someday be put.

■ In addition, the rule in New Mexico appears to be that unless minerals are specifically excluded, they pass with the estate. See *Duvall v. Stone*, 54 N.M. 27, 213 P.2d 212 (1949). Before severance of the subsurface minerals, possession of the surface implies possession of the minerals below. *Lykes Bros., Inc., v. McConnel*, 115 So.2d 606 (Fla.Ct.App.1959); *Hunsley v. Valter*, 12 Ill.2d 608, 147 N.E. 2d 356 (1958); *Smith v. Nyreen*, 81 N.W. 2d 769 (N.D.1957); *Dixon v. Henderson*, 267 S.W.2d 869 (Tex.Civ.App.1954). Also, when title to the surface passes by adverse possession (to which acquiescence is analogous and frequently compared, see, e. g., *State of Iowa v. Carr*, supra), the mineral estate is included. *Bremhorst v. Phillips Coal Co.*, 202 Iowa 1251, 211 N.W. 898 (1927). Moreover, a mineral lease is considered to be real property in New Mexico (*Terry v. Humphreys*, 27 N.M. 564, 203 P. 539 (1922)), and it is only logically consistent to hold that all the related real property interests embodied in a certain tract of land should pass together.

■ Thus, it becomes clear that when title to land is acquired by acquiescence, so are the mineral rights.

This conclusion is in accord with *Carter Oil Co. v. Stewart*, 36 F.Supp. 121 (E.D. Ill.1941), where the ownership of an oil well was determined by the fence line, long accepted by the landowners as the boundary, rather than according to the line fixed by government survey.

This brings us to the final issue presented on appeal, the viability of the limited appeal of the denial of Bokum's motion to set aside the judgment.

Bokum states that they appeal the order denying their motion "only to the extent that the denial of the motion might be considered a limitation on the defendants' ability to make the contentions that are made in the appeal of the Kerr-McGee suit."

This would present a puzzling limitation on the scope of appellate review and presents at least initial difficulties of interpretation.

Apparently, the "extent of prejudice" which Bokum seeks to appeal is the extent to which the court, in denying Bokum's motion to set aside the quiet title judgment, affirmed the original judgment quieting title in Sachs and determining the boundaries according to the metes and bounds description in the Turley survey. Presumably, Bokum raises this in order to avoid the res judicata effect of the quiet title decree as establishing the proper boundary.

■ In light of the preceding discussion and ruling indicating that the true boundary between the parties is the McKenzie fence line, binding for all purposes, it becomes clear that the denial of Bokum's motion to set aside the quiet title judgment is inconsistent with the decision we have reached and must be reversed, to the extent that it operated as an affirmance of the determination that the Turley survey marked the boundaries.

We reach this conclusion because the fence was built and "honored" as the boundary between the Sachs and the Grant tracts after the decree was entered in the Sachs quiet title suit. Therefore, the application of the "acquiescence" doctrine, as here found to be determinative of the issues raised, compels the result we have reached. From the time the fence was built in 1953 until the dispute as to ownership arose about 1974, the parties themselves used the lands on the basis that the fence built by Sachs was the boundary be-

tween the disputed tracts for all purposes other than payment of taxes and some conveyances by Sachs.

For the foregoing reasons, we conclude that the doctrine of acquiescence applies, making the long-recognized fence line the boundary between the parties for all purposes. Therefore, the trial court must be reversed. To the extent that it is inconsistent with this holding, the denial of Bokum's motion to set aside the 1951 quiet title judgment (based on the Turley survey's metes and bounds description) must also be reversed.

The cause is reversed and remanded to the District Court of McKinley County for the entry of an appropriate decision and judgment in accordance with the views herein expressed.

IT IS SO ORDERED.

OMAN, C. J., and SOSA, J., concur.