ETTA CORDELL v. JOHN P. SANDERS, Appellant.—52 S. W. (2d) 834.

Division One, September 3, 1932.

*C. M. Landis* for appellant.

*Jas. E. Sater* for respondent.

HYDE, C.—This is a suit in ejectment for the following described land in Barry County, Missouri, to-wit: "Commencing at the Southwest corner of the Southwest Quarter of the Northwest Quarter of Section 3, in Township 22, Range 25; thence North 67.8 feet to a fence; thence following the fence East one quarter mile; thence South 67.8 feet; thence West one quarter of mile to point of beginning, containing two acres more or less." Plaintiff has record title to the south half of the northwest quarter of Section 3 and defendant record title to the southwest quarter of Section 3. There is no question of adverse possession because both parties declare they claim only to the true line. The only question, therefore, is the determination of the true line between the quarter sections. Defendant claims that the west quarter mile of his north fence is on the true boundary line. The east quarter mile of his fence is set back south to leave a road and a spring. There is no controversy about it here.

Section 3, being an exterior section on the north line of the township, is fractional. The quarter section corner, which is the north-

west corner of the southwest quarter and the southwest corner of the northwest quarter, is lost. It appears from the evidence that the line between these two quarter sections has for a long time been in dispute. Plaintiff attempted to establish this quarter section corner by the evidence of two surveyors. One of them made a survey in 1902 and the other in 1929. These surveyors did not arrive at exactly the same point but within less than two feet of each other. There was formerly a rail fence about ten steps north of the quarter section corner located by the surveyors and defendant had been in possession to this rail fence. Plaintiff's grantor, after the first survey in 1902, built a fence on the line of that survey about twenty-six feet south of the old rail fence. Defendant brought a suit in ejectment, obtained a judgment, and was put back in possession and removed this fence. The proceedings in this former ejectment suit were not pleaded or put in evidence in this case. Thereafter, defendant built a new fence something like fifteen steps still farther north than the location of the old rail fence. That brought about the present law suit. Defendant claims the true boundary line is forty chains north of the southwest corner of Section 3, and that his new fence is on that line. Plaintiff claims this new fence is seven and one-half feet farther north than forty chains from the southwest corner of Section 3 and also claims that the true boundary line between the quarter sections is 67.8 feet south of the defendant's new fence.

The government survey subdividing Section 3 was not introduced in evidence. One of plaintiff's witnesses, who formerly owned land in the northwest quarter, testified that the north forty contained 38.09 acres, but the source of his information was not shown. One of plaintiff's surveyors was a State Highway surveyor who made the survey of 1929. He made a plat of his survey but it was not introduced in evidence He testified that the government survey was wrong and that "where it equals forty chains by government measure is thirty-nine chains and ten links by my chain. On the other side by government measure it is thirty-nine chains and ninety links. (this is also stated thirty-eight chains and ninety links) and by my tape line I make it thirty-eight chains and three links." He testified that he determined the southwest corner of Section 3, from which he commenced his survey, as follows:

"Q. I understand that you never established any section corner down there. A. It was not lost and was not necessary to establish it. Q. You never found it? A. I found the exact point where the corner should be and was from reference points. Q. Where did you start your survey? A. At the intersection of the two fences that are known to be on the section line, and also the intersection of the two roads that my notes in the office show were located on the section

line by Pleas Stubblefield in 1894. Q. You never found that corner stone? A. I located that corner at the intersection of the two fence lines that are known to be on the section line, and the two roads known to be on the section line. Q. You just assumed that they were? A. It was not necessary to survey, and there is no better way to get about it to establish a corner than the way I did. There is no other way to get the corner than the theoretical way I did. Q. But you never made any survey to determine that. You determined that by looking at the ground? A. That was all that was necessary.''

He established the quarter section corner from which he ran the line between the northwest quarter and the southwest quarter 39 chains and 10 links north of the southwest corner of Section 3. He said:

''I gave each section of land the measurement shown on the plats of the United States government—which was by proportionate measurement—I gave the half mile on the south side the forty acres government measure which was a little different from my chaining, and the north half mile thirty-eight chains and thirty-eight chains and ninety links, which is figured by government, which showed that their chain would equal ninety-seven point seven five six links as against my chain which would equal one hundred links, and at the point figured by proportionate measurement I drove an iron pin and measured into a number of trees for reference and recorded the survey. . . . Q. In other words, each half mile bears its percentage of the loss, rather than one-half mile taking all the loss? A. Yes, sir, it does.''

His chain man testified concerning the determination of the southwest corner from which the last survey started as follows:

''Q. Did you find any evidence of a corner being there? A. We didn't find no corner but we found the fences. We had two fences and two roads to get the points of beginning. Q. You just assumed there was a corner there because those two fences there and two corners. A. There was two roads that seemed to have been there quite a while. Q. There was no evidence of that corner outside of these fences and roads? A. We didn't find no rock. Q. Did you look for one? A. Yes, sir. The road had been cleared around in a curve. . . . Q. You never measured that to any other corner to establish this corner did you? A. No.''

Plaintiff's other surveyor, a former county surveyor, had made the survey of 1902. He said he made a record of his survey but he had lost the book and testified from recollection. He said that the west side of Section 3 measured about 175 links short of what the government field notes gave it. He said ''we didn't find the section corner,

however, on the west side of the section.'' Concerning the corner from which he started he testified as follows:

''Q. You don't know whether you started from the corner or not? A. I started from the recognized corner. It was fifteen feet west of what is now Kimball's fence, and it was in the center of the road west from there and south from there. Q. You didn't try to establish the fact that was a corner by any further surveying? A. I run that line. I started from the corner. We dug and found the corner. Q. Do you know whether you found the established corner or not? A. No, sir. Q. You didn't go out to establish a corner? A. We don't do that. When we find a corner that is not disputed we don't want any trouble. Q. You assume everybody was abiding by that? A. Yes, sir.''

As to how he then determined the boundary line between the southwest quarter and the northwest quarter he said:

''Just divided what belonged to each quarter as the shortage. I divided the shortage equitably. There was a shortage in the government survey? I determined that because there was a shortage between the distance across the section that the government field notes said should be there and the actual measurement.''

The court entered judgment for plaintiff for all of the land described in the petition and defendant has appealed therefrom. Defendant relies on two propositions for reversal. First: that he is entitled to 160 acres of land because the quarter section corner must be 40 chains north of the southwest corner of the section. Second: that plaintiff's evidence is insufficient to show that the land claimed is in the northwest quarter because neither of the surveyors found the southwest corner of the section.

Defendant bases his first proposition upon Knight v. Elliott, 57 Mo. 317, and Vaughn v. Tate, 64 Mo. 491, which followed it. In Knight v. Elliott, supra, a quarter section corner on the south line of a section, which was on the west line of the township, was lost. It was shown that the government survey reported the south line of the southeast quarter to be 40 chains in length and the south line of the southwest quarter to be 35.42 chains, and that the only partition fence ever erected between quarter sections started north exactly 40 chains west of the southeast corner of the section. It was found that the south line of the section was actually 2.37 chains longer than the total length reported in the field notes of the government survey. The question determined in that case was whether or not the excess should be divided between the quarter sections in proportion to the reported quantities of each or whether the southeast quarter should remain 160 acres and the excess all be put in the southwest quarter. (Whether the actual division was in proportion to acreage or length of lines is

not clear). The owner of the southeast quarter there, as does the plaintiff here, relied upon our statute, now Section 11600, Revised Statutes 1929, which provides as follows:

"In subdividing fractional sections, it shall be required to divide the excess or deficiency in length of lines over or under the original length of lines so surveyed by the deputy United States surveyor, in due proportion among the several subdivisions."

This court held that the west boundary of the southeast quarter must begin 40 chains west of the southeast corner of the section; that all of the rest of the half section constituted the southwest quarter; and that our statute was in conflict with the laws of the United States and the regulations provided thereunder governing survey of public lands, and was inoperative. It said:

"These regulations provided, that 'quarter section corners, both upon north and south and upon east and west lines, are to be established at a point equi-distant from the corresponding section corners, except upon the lines closing on the north and west boundaries of the township; and in those situations the quarter section corners will always be established at precisely forty chains to the north or west (as the case may be) of the respective section corners from which these lines respectively start; by which procedure the excess or deficiency in the measurement will be thrown, according to law, on the extreme tier of quarter sections.' [Lester's Land Laws and Regulations, p. 722; Manual of Surveying Instructions, p. 26; Keesling v. Fruit, 30 Ind. 306.]

"There is no question but that where the original monument fixed by the government for the corners bounding a tract of land can be found and identified, they are conclusive, and will govern without regard to courses and distances; but where these monuments cannot be found, the regulations of the United States Land Department require, that in sections bounded by township or range lines, where the quarter section corners cannot be found (as was the case in reference to the survey made in this case) the quarter section corner must be established by first finding or establishing the interior corners of the section, from which you are to measure exactly forty chains along the line in the direction of the township or range line, where the quarter section corner is to be placed; and which always leaves the excess or deficiency to the quarter directly on the township line; and it makes no difference whether the fraction contains more or less than the number of acres shown by the government field notes."

The regulations above cited apply to the original surveys of the government public lands. In applying them to land which has passed to private ownership, we think this court in Knight v. Elliott, supra, overlooked the distinction between an original correct survey of public

land by the government and a survey to relocate lost corners where the land is privately owned and the original government survey was wrong. In Keesling v. Fruit, the Indiana case cited in Knight v. Elliott, supra, there was no question of an incorrect government measurement. The question there was whether or not the quarter section should be divided equally or divided so that one tract contained 80 acres and the other 77.69 acres as shown by the government survey. A later Indiana case, Caylor v. Luzadder, 137 Ind. 319, 36 N. E. 909, 45 Am. St. Rep. 183, held that a different rule obtained where the original survey was incorrect in its measurement of the lines. The court said:

"There seems to be a well-recognized distinction between this rule as applied to original surveys, whether in the making of such surveys or in allotting the deficiency or overplus, when the correctness of such surveys is not questioned, and where such original surveys are found, to have been erroneous, or the original corners and lines are wholly lost. . . . The purchasers and the government acted upon the assumption that the lines were correctly measured and returned by the deputy surveyor. In this all were alike deceived; the length of lines is less than that so acted upon, and by every principle of equity the deficiency should be borne by the several tracts in proportion to the quantities so presumed to be contained therein at the time of the purchase. This theory has been expressly adopted by the commissioner of the general land office since June 2, 1887, if not since an earlier period. In the instructions of Commissioner SPARKS of that date it is said: 'In the subdivision of quarter sections, the quarter-quarter corners are to be placed at points equi-distant between the section and quarter-section corners, and between the quarter corners and the common center of the section, except in the last half mile of the lines closing on the north or west boundaries of a township, where they should be placed at twenty chains, proportionate measurement, to the north or west of the quarter-section corner.' 'Proportionate measurement' is defined as 'a measurement having the same ratio to that recorded in the original field notes as the length of the chain used in the new measurement has to the length of the chain used in the original survey, assuming that the original measurement was correctly made.' "

The distinction made by this case is very generally recognized. [Galbraith v. Parker (Ariz.), 153 Pac. 283; Tolson v. Southwestern Improvement Assn. (Ark.), 133 S. W. 603; Luther v. Denny (Ark.), 1 S. W. (2d) 6; Moreland v. Page, 2 Iowa, 139; James v. Drew (Miss.), 9 So. 293, 24 Am. St. Rep. 287; Christ v. Fent (Okla.), 84 Pac. 1074; Jones v. Kimble, 19 Wis. 429; Westphal v. Schultz (Wis.), 4 N. W. 136; 9 C. J. 297, sec. 361; 4 R. C. L. 115, sec. 53; Ann. Cas. 1912A, 1275, note.] In fact, no other state appears to have adopted

the rule of Knight v. Elliott, supra, where the original survey was incorrect, nor is it now the rule (if it ever was) of the United States Government. The government regulation referred to in Caylor v. Luzadder, supra, providing for proportionate measurement in establishing corners in fractional quarter sections has been carried down to the present time by the Department of the Interior as the proper method of reestablishing quarter section corners on closing section lines between fractional sections. ''This class of corners must be reestablished proportionately, according to the original measurement of 40 chains from the last interior section corner. If the whole measurement does not agree with the original survey, the excess or deficiency must be divided proportionately between the two distances expressed in the field notes of the original survey.'' [See circular on Restoration of Lost or Obliterated Corners, General Land Office, March 14, 1901, sec. 7; Harris Public Land Guide, p. 371; Regulations of United States Government Land Office on Restoration of Lost or Obliterated Corners and Subdivisions of Sections, Revision of June 1, 1909, sec. 59; see, also, United State Department of Interior, 1930, Manual of Instructions for the Survey of Public Lands of the United States, p. 263 to 277, secs. 348 to 386.]

In the 1930 Manual we find in Section 363 the following:

''Existing original corners cannot be disturbed; consequently discrepancies between the new and original record measurements of the line connecting the identified original corners will not in any manner affect measurements beyond said corners, but the differences will be distributed proportionately within the several intervals embraced in the line in question.''

And Section 355 states:

''It will almost invariably happen that discrepancies will be developed between the new measurements and the original measurements recorded in the field notes. When these differences occur the engineer will generally be required to adopt a proportionate measurement based upon the process followed in the original survey.''

Section 375 states:

''All lost exterior section and quarter section corners will be restored by single proportionate measurement between the nearest identified corners on the opposite sides of the missing corner, north and south on a meridianal line, or east and west on a latitudinal line, *after* the township corners have been identified or relocated.''

Section 364 states:

''A proportionate measurement is one resulting in concordant relation between all parts of an original record length of a line and the new distances given to the several parts as determined by measurement, in such a manner that the new distance given to any part of a

line shall bear the same relation to the original record length of that part of the line as the new measurement of the whole line bears to the original record length of said line.''

Section 365 states:

''The term 'single proportion measurement' is applied to a new measurement made on a single line to determine the position thereof for restoring a lost corner, for example, a quarter section corner on line between two original section corners.''

■ ■ ■ Whatever may have been the regulations of the government land office at the time this court decided the case of Knight v. Elliott, supra, it appears that there is now no conflict between the government regulations and our statute. Furthermore, as said by this court in Simpson v. Stewart, 281 Mo. 228, 219 S. W. 589: ''That the rule of the General Land Office is controlling in every instance where it is sought to reestablish a lost internal section corner on the public lands of the United States is beyond question. But as to lands in this State, the titles to which have passed to private owners and the jurisdiction of the general government in respect to the surveys thereof has ceased, can be regarded as advisory only.'' This rule is recognized in the 1930 Manual of the Department of the Interior, page 20, section 10, and page 178, section 195. Our conclusion about the whole matter, therefore, is: First, where quarter section corners established by the Government can be found or identified they control, regardless of mistakes in lengths of lines between section corners; second, where a quarter section corner is lost and the distance between two existing known section corners is actually different from that shown by the government survey, if it is in a regular interior section where each quarter section is reported to have the same dimensions, the quarter section corner will be reestablished midway between the section corners; third, where the distance between two known corners of a fractional section on the north or west side of a township is different from that reported in the government survey and the exterior quarter section corner is lost, it will be reestablished by proportionate measurement so that the excess or deficiency in length of lines will be divided proportionately between the two quarter sections as required by our statute; fourth, when this is done the new distance given to exterior line of each quarter section will bear the same relation to the original record length of the exterior line of each quarter section as the new measurement of the whole exterior section line bears to the original record length of said line, as required by the government regulations ■ Therefore, defendant's contention that regardless of whether or not the original government survey is incorrect and less than the actual length of the west side of Section 3, he is entitled to have the northwest corner of the southwest quarter established 40

chains north of the southwest corner of the section cannot be sustained. Insofar as Knight v. Elliott, 57 Mo. 317, and Vaughn v. Tate, 64 Mo. 491, are in conflict with the views herein expressed, they are overruled.

■ However, we think defendant is correct in his contention that plaintiff's evidence was insufficient to reestablish the lost quarter section corner and to show in which quarter section the land in controversy was located. It may be that the point at which plaintiff's surveyors commenced to survey is the southwest corner of Section 3, but plaintiff did not prove that it was. The testimony of these surveyors, which is hereinabove set out, shows that the original corner monument could not be found and that they assumed that the place from which they started was the section corner from the roads and fences. If they had other information upon which to base this assumption it was not introduced in evidence. Their testimony is replete with conclusions of fact or of law rather than evidence in regard to facts. If the roads were on the section lines the section corner might have been either on the north side of the road, the south side of the road, or in the middle of the road. Evidence of a survey which is not definitely shown to have commenced from a corner established by the government or, if lost, reestablished in accordance with our statutes is of no probative force. [Clark v. McAtee, 227 Mo. 152, 127 S. W. 37, 253 Mo. 196, 161 S. W. 698; Atkins v. Adams, 256 Mo. 2, 164 S. W. 603; Nelson v. Cowles, 193 S. W. 579; Wright Lumber Co. v. Ripley County, 270 Mo. 121, 192 S. W. 996.] There is not even one word of evidence in this record that the northwest corner monument of Section 3 was found or that this corner was otherwise properly established. A surveyor's testimony "is never receivable except in connection with the data from which he surveys, and if he runs lines they are of no value unless the data are established from which they are run, and those must be distinctly proven, or there is nothing to enable anyone to judge what is the proper result." [Jones v. Lee (Mich.), 43 N. W. 855; see, also, Roberts v. Lynch, 15 Mo. App. 456; Dolphin v. Klann, 246 Mo. 477, 151 S. W. 956.] Plaintiff, on another trial, may be able to show a survey between definitely established corners which would prove that the land sued for or some part of it is in the northwest quarter. Furthermore, on another trial, the court should have the benefit of the United States government survey; (see Secs. 11590-11592, R. S. 1929), and also the plat made by the surveyor. [Atkins v. Adams, 256 Mo. 1. c. 17, 164 S. W. 603.]

The judgment is reversed and the cause remanded. *Ferguson* and *Sturgis, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE C., is adopted as the opinion of the court. All of the judges concur.