**Bill J. YOCOM and Dollie A. Yocom, Respondents,**

v.

**Sheridan E. KINDLE, Executor of the Estate of Dealie E. Drennon, deceased, Appellant.**

No. 15776.

Missouri Court of Appeals, Southern District, Division One.

March 3, 1989.

Gene A. Hilton, Hilton and Bennett, Camdenton, for appellant.

Michael L. McDorman, McDorman & Hayden, Versailles, for respondents.

CROW, Presiding Judge.

Plaintiffs Bill Joseph Yocom ("Bill") and Dollie Amanda Yocom ("Dollie") sued defendant Sheridan E. Kindle, Executor of the Estate of Dealie E. Drennon, deceased, praying the trial court to (1) set aside and cancel a contract between plaintiffs and defendant for the purchase of a tract of real estate, (2) set aside and cancel a warranty deed from defendant conveying the tract to plaintiffs, and (3) award plaintiffs $29,300, representing the purchase price paid by plaintiffs to defendant for the tract. The trial court entered judgment as prayed.

Defendant appeals, briefing two points. The first avers the trial court erred in receiving in evidence (a) the testimony of a surveyor regarding a survey he made of the tract, together with the plat of his survey, (b) the testimony of the same surveyor regarding the plat of the subdivision where the tract lay, together with a copy of the subdivision plat, and (c) the testimony of the county assessor regarding "the property ownership map," together with a copy of the map. Defendant's second point charges the trial court with error in denying defendant's motion for judgment at the close of plaintiffs' evidence and in entering judgment for plaintiffs, in that proof of the location of the boundary lines of the tract was an element of plaintiffs' cause of action and plaintiffs' evidence on that element was of no probative force.

The plat of the survey referred to in clause "(a)" of the second sentence of the preceding paragraph was designated as Plaintiff's Exhibit 4 at trial.[1] A copy of the relevant portion of the exhibit is appended to this opinion and labeled "Exhibit 4." The "Existing Roadway" shown on the exhibit runs generally north to south, north being at the top of the exhibit and south at the bottom.

The tract in dispute, as described in the warranty deed referred to in clause "(2)" of the first sentence of this opinion, is:

"Lot 109 and Lot 110 in the Golden Goose Subdivision ... according to the Plat thereof on file and of record in ... the Office of the Recorder of Deeds of Camden County, Missouri, EXCEPTING THEREFROM, a parcel of land heretofore conveyed to Michael J. Cesaretti and Robin D. Cesaretti, his wife, as shown by instrument recorded in Book 243 at Page 981, records of Camden County, Missouri."

The conveyance to the Cesarettis referred to in the above-quoted description was executed by defendant February 18, 1983, and conveyed the following land:

"In the Golden Goose Subdivision ... according to the Plat thereof on file and of record in ... the Office of the Recorder of Deeds for Camden County, Missouri:

1. Although there are two plaintiffs the exhibit was marked "Plaintiff's Exhibit 4," the singular possessive form. (Emphasis added.) That is likewise true of the other exhibits presented at trial by plaintiffs. In this opinion we quote the transcript as we find it and, in referring to plaintiffs' exhibits, we employ the designations used at trial.

All that part of Lot 110 described as follows: Commencing at the Southeast corner of said Lot 110, being also a point on the East right-of-way line of existing roadway; thence Northerly along said Eastern right-of-way line to a point on the Northern boundary line of said Lot 110 (being the boundary line common to said Lot 110 and Lot 111) for the point of beginning; thence Easterly along said boundary line to the Northeast corner of said Lot 110; thence Southwesterly along the waters edge of the Lake of the Ozarks a distance of 45 feet; thence Westerly to a point on the Eastern right-of-way of said roadway which lies South a distance of 10 feet from point of beginning; thence North along said Eastern right-of-way line 10 feet to the point of beginning."

The tract conveyed to plaintiffs by defendant was an inventoried asset of the estate of Dealie E. Drennon, deceased. Defendant, as executor of the estate, engaged Pine Cone Real Estate of Climax Springs to sell the tract by letter of December 16, 1984. That letter said, in pertinent part:

"3 Bdr Home on 2 Waterfront Lots, 109 & 110 ... (Note Small Strip of worst Water, 10 ft. at road & 45 on water sold, leaving 50 of lot 110 & 50 foot of lot 109 on waterfront.) The best water 109 is not contacted by this strip referred to. It is on north line of lot 110. Leaves total of 100 foot waterfront total.... Easy to Winterize, has heat Tape on water lines & heater in Pump House...."

A letter dated November 24, 1985, from defendant to Glenn Barnes of Pine Cone Real Estate read, in pertinent part:

"Your listing showed the strip sold to Mike Cesaretti in 1983. I will enclose for your use, & send to others if this deal does not Clsoe [sic]. This is a strip of worst water 10 ft. at road, & 45 at waterline. This leaves 50 of water lot 110 & 50 lot 109. I will enclose a copy of lots showing widening of lot 110 toward water, with 95 feet along water. The worst 45 sold to Cesaretti or north line. Before the Truman Dam sometimes water was not up in end of Bay. The Cesarettis & Relatives own lots 111, 112, 113, 114, & house thereon. They also own Strip behind house or above house all along north. They bought it to assure themselves water, & above house to protect their Investment there....

The Legal should be—Lot 109 & all of lot 110, except strip sold Mike Cesaretti, & recorded 3–2–83, book 243, page 981...."

Plaintiffs, husband and wife, came to Camden County in November, 1985, from Arizona, looking for a home to purchase. Bill, age 55 at time of trial,[2] is a retired overhead crane operator with an eighth grade education. Dollie, age 54 at time of trial, has a seventh grade education. Neither had ever been a real estate salesperson or surveyor.

Plaintiffs contacted Pine Cone Real Estate and were shown the subject tract by Barnes. They were also shown the letters from defendant dated December 16, 1984, and November 24, 1985, portions of which are quoted *supra.*

Describing what they saw when they viewed the tract, Bill testified:

"... there was a three-bedroom home like it's stated in the paperwork, and there was a well and two-car garage, along with two stakes in the back of the property which well cleared the house and also footage behind the well. It was—there was a few feet between the house and the two back stakes.

Q So you were shown stakes at the back of the property?

A Yes.

....

Q ... What you were shown as to the waterfront?

A We were told that our property lines went all the way to the water.

Q Were you told as to how much waterfront there would be?

A 100 foot.

Q Mr. Yocom, were these statements as to the location of the stakes important

2. Trial occurred April 27, 1988.

to you in making your decision to make an offer on this property?

A Yes, it was.

Q Was the representation as to the fact that the well was contained on your property important to you in making a decision to purchase this property?

A Yes, it was very much important; otherwise we would not have bought the home.

Q Were the representations as to the amount of lakefront being 100 foot important to you in making your decision to purchase this property?

A Yes, that's what we were looking for in order to buy here."

Dollie's testimony included this:

"Q Were you also told that a well and well house went with the property?

A Yes, we were.

Q Did you go and physically inspect the property before you purchased it?

A Yes.

Q Were you shown an area and stakes as to the back area of the property?

A Yes, we were.

Q Did you rely upon where those stakes were?

A Yes, we did.

Q Were you also shown a well house or pump house?

A Yes.

. . . .

Q Were you also shown the shoreline of the property?

A Yes, we were."

Relying on defendant's two letters and what they had seen and been told, plaintiffs contracted to purchase the tract for $29,300. The sale was closed December 16, 1985, plaintiffs receiving the deed quoted from *supra*. Bill testified that prior to the purchase he had requested that defendant survey the property.

On June 16, 1986, defendant sent a letter to Dexter Slagle, a registered land surveyor at Versailles. The letter said, in pertinent part:

"I am sending a copy of a Deed . . . that shows a strip off northern part of lot 110 sold to Mike Cesaretti. This also shows the Legal Description of this Lot 109 & all of 110 except strip sold to Mike Cesaretti. This MR. Bill Yocom needs the corners of the lots 109 & . . . 110 staked and the spot 45 foot up line at water where his 50 foot of water starts. Also the corners of 109 either in the Road or one side or the other. You cant [sic] stake in road but show at one side or the other & inform Mr. Yocom.

. . . .

Bill to the Dealie Drennon Estate, & send to above address."

Slagle made the survey and prepared a plat—Exhibit 4 appended to this opinion is the relevant portion—depicting the results. The exhibit shows only the east one foot of the well house is on the tract deeded to plaintiffs; the west three feet of the well house are not. The exhibit also shows that the east boundary of lot 109 is not the shoreline, but is instead the east edge of the roadway, 37 feet west of the shoreline. Additionally, the exhibit shows that the east boundary of the part of lot 110 deeded to plaintiffs—being all of lot 110 except the portion deeded earlier to the Cesarettis—is not the shoreline, and that the closest the east boundary of plaintiffs' part of lot 110 comes to the shoreline is 24.5 feet. Finally, the exhibit shows that the shoreline east of the tract deeded to plaintiffs measures 80 feet, not 100.

Plaintiffs were sent a copy of the plat of Slagle's survey. They subsequently filed this suit, alleging that in order to induce them to buy the tract defendant represented that the tract had 100 feet of "lakeshore frontage" when the tract had only 80 feet of "actual shoreline," that defendant represented the well was located on the tract when only an "extremely small fraction" of the well was located thereon, and that defendant represented certain "stakes and pegs" accurately showed the boundaries of the tract when in fact the stakes and pegs did not. Plaintiffs' petition further averred defendant knew or should have known that his representations were false.

At trial defendant conceded he intended that prospective buyers rely on the information in his letters quoted earlier in this opinion. Asked about the shoreline of the subject tract, defendant replied: "There is no shoreline on 109 and 110. There is waterfront, there is no shoreline." Then, this:

"Q Could you explain ... what you mean by that?

A ... On the lake, the shoreline belongs to the organization that put the dam in. On these lots you will show a wide area, which he has a long slope where the water is allowed to back up without getting on your land.

When these were surveyed, they were very careful that these did not go over the high line—the high water line. The one you're seeing here calling shoreline is where they are if they have an average water, where they keep all lakes in the United States, as far as I know, and that was where they want to keep the water.

They go up above it and they leave themselves, we will say, fifteen feet or twenty, for going higher before it gets under water. When the[y] survey they are very careful that this is not over that line, maybe 6 foot from it one place and one foot another place. Their lines must be straight, and they survey them with that in mind, not to overflow the high line. And the high line down to the shoreline in this area is several feet.... And that's why all this territory, belong to ... whoever it is that owns the dam."

Defendant was asked by plaintiffs' lawyer to mark on Exhibit 4 where plaintiffs' property line would be in relation to the closest point of the lake. Defendant indicated the line on the east side of lot 109 and the line on the east side of lot 110, each such line marked "Lot Line" on Exhibit 4, and testified that plaintiffs' line was "[s]omewhere in that area, should be that line." Defendant added: "I don't know exactly.... I knew it was in that general area, but I didn't know exactly where it was."

Plaintiffs presented Wayne Whitworth, Assessor of Camden County, as a witness. He identified Plaintiff's Exhibit 9 as an aerial photograph showing, among other properties, lots 109 and 110. Whitworth testified the exhibit was a copy of a record maintained in his office. On the exhibit were lines ostensibly showing the boundaries and dimensions of plaintiffs' tract. Whitworth explained that the information used in drawing the lines came "off the deeds." He added that in showing the boundaries of parcels in a subdivision his office uses information from recorded subdivision plats.

Plaintiffs offered Exhibit 9 in evidence. Defendant objected that the exhibit "appears to be a survey or at least based upon a survey, and there's been an insufficient foundation for its admission because there's been no showing that's [sic] its [sic] based upon any survey commencing at a government corner." The trial court overruled the objection and received Exhibit 9 in evidence.

Whitworth, referring to Exhibit 9, then testified that the west line of plaintiffs' tract was 100 feet in length, the north line was "155 feet but irregular," and the south line was 145 feet. Then, this:

"Q And then the east line is 80 feet?

A Yes.

Q And that's the shoreline area; is that correct?

A Yes."

As to the two questions and answers quoted above, Exhibit 9 appears to show the east boundary of plaintiffs' tract as the *shoreline*. In that respect Exhibit 9 differs from Exhibit 4 which, it will be recalled, shows the east boundary of plaintiffs' tract is 37 feet west of the shoreline at the tract's southeast corner and 24.5 feet west of the shoreline at the tract's northeast corner.

Whitworth conceded that the dimensions of plaintiffs' tract were not shown on their deed. He also revealed that while Union Electric's "contour level" on most lakefront properties is 660 feet he did not know the contour level for Golden Goose subdivision and he likewise did not know the contour

level of the lake on the day the photograph was taken. According to Whitworth, lakefront property as a general rule "would have more value than property that's not lakefront." He added that a parcel of land with 100 feet of lakefront would be worth more than a parcel with 80 feet of lakefront.

Surveyor Slagle, called as a witness by plaintiffs, testified that prior to surveying the subject tract he obtained a copy of the plat of Golden Goose subdivision. He identified Plaintiff's Exhibit 10 as a "true and accurate copy" of the subdivision plat. Asked whether the plat was "tied to a government or section corner," Slagle responded that the person who did the survey tied the subdivision "to the section line and so many feet from the section corner on the plat." He pointed out a circle on the plat purporting to be the common corner of sections 21, 22, 27 and 28 of township 20 north, range 19 west, and identified such point as the "[s]ection corner." Slagle explained that he obtained the field notes of the surveyor who had prepared the subdivision plat, and that he (Slagle) used such notes in performing his survey. Slagle then identified Plaintiff's Exhibit 4 as a copy of the plat of his survey, and disclosed that he found, among other markers, one at the corner of lots 106 and 107 (inferably the "iron stake" shown near the lower left corner of Exhibit 4 appended to this opinion), and one at the corner of lots 110 and 111 (inferably the "iron stake" shown on Exhibit 4 as having been buried in a rock pile). Slagle confirmed he was satisfied that the survey he prepared "was an accurate survey of Lots 109 and 110."

Plaintiffs thereupon offered Plaintiff's Exhibit 4 and Plaintiff's Exhibit 10 in evidence. Defendant registered the following objection:

"As to Plaintiff's Exhibit Number 4, which is the Slagle survey, objection is that there has been insufficient foundation for its admission because there has been no showing that this survey commenced at a government corner.

As to the Plaintiff's Exhibit Number 10, which is the copy of the plat of Golden Goose Subdivision, the objection is the same, that there is insufficient foundation because there has been no showing that it commenced at a government corner."

Following defendant's objection the transcript shows this:

"The Court: Mr. Slagle, let me ask you this. As a licensed surveyor, you've outlined procedure that you followed in preparation of Plaintiff's Exhibit 4. Do you believe Plaintiff's Exhibit 4 is tied to a government corner based upon the procedures that you followed?

Witness Slagle: The one, I did—no, I did not tie it to a government corner and only used existing marked corners of Golden Goose Subdivision.

The Court: Objection sustained."

Slagle, under further questioning by plaintiffs' lawyer, testified that his survey was based on "existing corner monuments" he found by using the field notes of the surveyor who had prepared the subdivision plat, and that such monuments were "referenced" on the subdivision plat. Plaintiffs thereupon reoffered Plaintiff's Exhibit 4. Defendant reasserted his earlier objection. The trial court overruled the objection and received Plaintiff's Exhibit 4 in evidence.

Further questioning of Slagle by defendant's lawyer produced this:

"Q Mr. Slagle, as to Plaintiff's Exhibit 4, is there any place on that exhibit tying that exhibit to a government corner?

A No, not my own personal survey.

Q Do you have with you—referring to Plaintiff's Exhibit 10, do you have records or anything indicating the courses and distances tying this plat to a government corner?

A No, not to a government corner. The plat shows a section corner, doesn't say any government corner.

. . . .

Q So your testimony is that you cannot say that Plaintiff's Exhibit Number 10 commenced at a corner established by the government?

A No, I cannot say that."

Defendant promptly objected to Plaintiff's Exhibit 10 and renewed his objection to Plaintiff's Exhibit 4. The trial court said: "Objection overruled. I'm admitting both Plaintiff's Exhibit 4 and 10. I am permitting them not as surveys but as diagrams of the area and measurements that were made based upon the monuments that have been shown to be in evidence."

Slagle then testified that the well house shown on Exhibit 4 measured four feet by four feet (inferably length and width, not height) and that about three feet of the structure—"[r]oughly 75 percent"—was not within lots 109 or 110. Slagle further testified that he measured the shoreline shown on Exhibit 4 and that it was 80 feet long.

Slagle recounted that the "easternmost" line of lot 109 was "[a]long the easterly line of existing road." He explained that the lines designated "Lot line" on the east sides of lots 109 and 110 on Exhibit 4 were the "actual lot lines." According to Slagle, the east line of lot 109 measured 50.8 feet, and the east line of the portion of lot 110 deeded to plaintiffs measured 51.43 feet. Asked how he determined the location of those lines, Slagle answered: "Well, I had, of course, the recorded plat, anybody that's seen it knows there's many dimensions missing on it and that is the reason I got his, the old Mr. Brown's who surveyed these lots and got his field notes which indicated these lots and so forth." Then, this:

"Q Do the lakefront lines correspond to the lakefront lines shown on the plat of this subdivision?

A Not the lakefront.

Q The lot line?

A The lot lines don't go down to the lake."

Asked why he drew the shoreline where he did on Exhibit 4, Slagle replied, "Well, that was full reservoir line of the Lake of the Ozarks." His testimony continued:

"Q How do you know that?

A Well, I've surveyed for years and years; you can tell where it washes up to a certain point or you can use an elevation and establish it that way.

Q Did you use an elevation?

A I did not use—I took it where the line—where it washed to the lake.

Q What is the full contour of Lake of the Ozarks?

A 660 feet above sea level.

. . . .

Q When you drew in this lake line for the shoreline, you did not determine exactly what the lake level was on that date; is that correct?

A Not that date, no, I did not.

. . . .

Q What are you calling the shoreline?

A What I am calling the shoreline is what I thought was its full reservoir line because that's where the water comes and washes and full reservoir."

After Slagle's testimony Bill returned to the witness stand and testified he would not have purchased the tract had he seen the plat of Slagle's survey prior to the transaction. Then, this:

"Q There was a dock located on the property when you first saw it, wasn't there?

A At the corner of 109, yes.

Q Showing you Plaintiff's Exhibit 4, I think that I have drawn in here where Mr. Kindle indicated the dock was?

A That is close, yes.

Q That is the line that you were shown as the corner line?

A Yes, it is.

Q Being at the lake itself?

A Yes."

Dollie returned to the stand and testified that had she known the true dimensions of the tract and the location of the improvements prior to the purchase she would not have bought the property.

■ We first consider the part of defendant's first point wherein he complains of the admission in evidence of Assessor Whitworth's testimony and Plaintiff's Exhibit 9, the aerial photograph on which lines purporting to show the boundaries of plaintiffs' tract had been superimposed. Defendant's complaint is based on the firmly entrenched principle that evidence of a

survey which is not definitely shown to have commenced from a corner established by the government or, if lost, reestablished in accordance with statutes governing reestablishment of lost government corners, is of no probative force. *Carroz v. Kaminiski*, 467 S.W.2d 871, 872 (Mo. banc 1971); *Klinhart v. Mueller*, 166 S.W.2d 519, 523[1] (Mo.1942); *Cordell v. Sanders*, 331 Mo. 84, 52 S.W.2d 834, 838–39[6] (1932). Defendant points out there was no testimony indicating that the boundaries of plaintiffs' tract shown on Plaintiff's Exhibit 9 were based upon a survey tied to a government corner.

Plaintiffs respond that Exhibit 9 was admissible as a business record. Assuming, without deciding, that Exhibit 9 was admissible on that theory, the exhibit did no more than show the land on which plaintiffs were apparently being assessed taxes. As the boundaries of plaintiffs' land, as depicted on the exhibit, were not shown to have been drawn in reliance on a survey commenced from a government corner or from a lost government corner reestablished pursuant to statutory requirements, the exhibit and Whitworth's testimony regarding the location and dimensions of plaintiffs' property lines could not have been of probative force in establishing, as between plaintiffs and defendant, the boundaries of the subject tract. *Carroz*, 467 S.W.2d at 872. That being so the exhibit, even if admissible as a business record, did not prove anything relevant to plaintiffs' cause of action.

As this was a court-tried case we assume the trial judge gave no weight to Whitworth's testimony or Exhibit 9 on the issue of the location or dimensions of the boundaries of plaintiffs' tract. *Pike v. Pike*, 609 S.W.2d 397, 403[10] (Mo. banc 1980); *Spielberg Mfg. Co. v. Direct Sales Intern., Inc.*, 566 S.W.2d 839, 840[2] (Mo.App.1978). The trial court's admission of such evidence thus supplies defendant no ground for reversal. The significance of the absence of probative force in such evidence will be considered *infra* when we reach defendant's second point.

It is ironic, however, that but for one exception there was nothing harmful to defendant in Whitworth's testimony and Exhibit 9. Such evidence, had it been of probative force regarding the location and dimensions of the boundaries of the subject tract, would have shown that the tract's east boundary is the shoreline, which was where defendant allegedly represented to plaintiffs that it lay. Additionally, the well house is not discernible on the exhibit; consequently, the exhibit demonstrates nothing in regard to whether the well house lies on or off the subject tract. The only respect in which Whitworth's testimony and Exhibit 9 would have been harmful to defendant, had such evidence been of probative force, would have been in showing that plaintiffs' shoreline measured 80 feet instead of 100.

We next consider the part of defendant's first point wherein he complains of the admission in evidence of Plaintiff's Exhibit 10, a copy of the recorded plat of Golden Goose subdivision, and surveyor Slagle's testimony regarding the exhibit. Defendant asserts that inasmuch as Exhibit 10 was not shown to have been tied to a government corner or to a lost government corner reestablished pursuant to statutory requirements, Exhibit 10 was of no probative force.

In considering defendant's argument it must be remembered that the trial court received Exhibit 10, along with Plaintiff's Exhibit 4, "not as surveys but as diagrams of the area and measurements that were made based upon the monuments that have been shown to be in evidence." We infer from that ruling that the trial court was endeavoring to honor the principle that evidence of a survey which is not definitely shown to have commenced from a corner established by the government or, if lost, reestablished in accordance with statutes governing reestablishment of lost government corners, is of no probative force.

We have carefully studied Plaintiff's Exhibit 10, which is drawn in extremely small scale, and the only monuments that appear to be shown on it are the roadway and the shoreline. With respect to the shoreline

there are four curving lines east of lots 109 and 110. The line nearest the lots appears to be a broader line than the other three. Which line represents the shoreline of the lake at 660 feet elevation is not explained on the exhibit. The only other relevant item we find on the exhibit is that the east line of lot 109 appears to be the east line of the roadway. The location of the "section corner" referred to by Slagle is shown on the exhibit, but we cannot determine from the exhibit or Slagle's testimony whether a monument is embedded in the ground at that point.

The objects found by Slagle and referred to in his testimony consisted of the roadway, the shoreline, the well house, the dwelling house, and certain iron stakes. The well house, the dwelling house, and the stakes are not shown on Plaintiff's Exhibit 10. Slagle, in testifying about the measurements he made, referred exclusively to the plat of his survey, Plaintiff's Exhibit 4.

In Missouri a copy of a plat recorded in the office of the recorder, properly certified under his hand and official seal, shall be evidence in all courts. § 445.040.2, RSMo 1986. On Plaintiff's Exhibit 10, identified as a copy of the plat of Golden Goose subdivision, we find what purports to be a certificate by the Recorder of Camden County that the plat was filed for record in such office July 9, 1962, and is recorded there. Defendant voiced no objection at trial to the admission in evidence of Exhibit 10 on the ground that it was not properly certified. The trial court consequently did not err in receiving Exhibit 10 in evidence for the limited purpose articulated by the trial court. Whether Exhibit 10, in view of the meager information on it and the limited purpose for which the trial court received it, proved anything relevant to plaintiffs' cause of action will be considered *infra* when we reach defendant's second point.

We next address the part of defendant's first point wherein he complains of the admission in evidence of Plaintiff's Exhibit 4, a copy of the plat of Slagle's survey, and Slagle's testimony regarding the exhibit. Defendant asserts that inasmuch as Slagle conceded he did not begin his survey at a government corner or at a lost government corner reestablished pursuant to statutory requirements, the survey was not competent evidence and had no probative force.

The trial court, as we comprehend its remarks at the time it received Exhibit 4 in evidence, admitted the exhibit not as a survey but merely as a diagram of the area in dispute and the measurements made by Slagle based on the monuments shown to be in evidence.

It will be recalled that defendant testified prior to Slagle. Defendant, as noted earlier, acknowledged that the east boundary of plaintiffs' tract was somewhere in the general area of the lines denominated "Lot Line" on Exhibit 4. That defendant knew the northeast corner of lot 109 (said point also being the southeast corner of lot 110) lay on the east edge of the roadway is demonstrated by the property description in the deed executed by defendant to the Cesarettis in 1983. The description, quoted *supra*, states that the southeast corner of lot 110 is a point on the east right-of-way line of the existing roadway. The south end of the southernmost of the two lines denominated "Lot Line" on Exhibit 4 is an iron pin set by Slagle at the east edge of the roadway, 37 feet west of the shoreline. The north end of the northernmost line is an iron pin set by Slagle 24.5 feet west of the shoreline. We assume the trial court, in referring to the monuments shown to be in evidence, meant not only those found by Slagle but also the pins he set. Slagle testified that when he projected the line from the southernmost of the two pins mentioned above to the shoreline, and projected the line from the northernmost of the two pins mentioned above to the shoreline, the length of the shoreline between the points where the projected lines intersected it was 80 feet.

 We hold that defendant's admission that the east boundary of plaintiffs' tract lay somewhere in the general area of the lines denominated "Lot Line" on Exhibit 4, coupled with Slagle's testimony regarding the measurements mentioned in the preceding paragraph, was sufficient to

support a finding that the tract deeded by defendant to plaintiffs did not extend to the shoreline but instead lay some 30 feet or more west of the shoreline at the tract's southeast corner and some 20 feet or more west of the shoreline at the tract's northeast corner. Such evidence was also sufficient to support a finding that the length of the shoreline east of the east boundary of plaintiffs' tract was not 100 feet, but instead was nearer 80 feet. We emphasize that these findings are supported without accepting as correct any boundary line established by Slagle's survey. That is consistent with the trial court's ruling admitting Exhibit 4 in evidence only as a diagram of the area and the measurements made by Slagle based on the monuments shown in evidence.

As to the well house, Slagle's survey revealed that the west three feet of the structure lay west of the west boundary of plaintiffs' tract. Defendant, however, made no admission regarding the well house; consequently, the only way for plaintiffs to establish that the tract deeded them by defendant did not include all the well house was by Slagle's survey. That is, the location of the west boundary of plaintiffs' tract, as fixed *on the ground* by Slagle in his survey, was the *only* proof offered by plaintiffs that the well house was not situated entirely on their land.

The trial court, however, did not accept Exhibit 4 as a survey, presumably because of Slagle's admission that in making his survey he did not start at a government corner. Therefore, Exhibit 4, viewed within the limits imposed on it by the trial court, did not establish the location of plaintiffs' west boundary or prove that all of the well house did not sit on plaintiffs' tract. The significance of that will be considered *infra* when we address defendant's second point.

So far as defendant's first point is concerned, we hold that the trial court did not err to the prejudice of defendant in receiving Exhibit 4 in evidence for the limited purpose announced by the trial court. Whether the trial court should have received Exhibit 4 in evidence as a survey and accorded the exhibit probative force as a survey is not before us in this appeal, hence we express no opinion on that issue. Defendant's first point is denied.

Defendant's second point reads:

"The trial court erred in denying defendant's motion for judgment at the close of plaintiffs' evidence and in entering judgment for plaintiffs and against defendant, because plaintiffs failed to make a submissible case, and the judgment was against the weight of the evidence and an erroneous application of law, in that proof of the location of boundary lines was an element of plaintiffs' cause of action and plaintiffs' evidence regarding the location of the boundary lines was of no probative force because the survey plat [Plaintiff's Exhibit 4], the subdivision plat [Plaintiff's Exhibit 10] and the property ownership map [Plaintiff's Exhibit 9] were not shown to be based upon a survey which commenced from a corner established by the government."

In our consideration of defendant's first point we have agreed with his contention that Whitworth's testimony and Plaintiff's Exhibit 9 were without probative force in establishing, as between plaintiffs and defendant in this suit, the location or dimensions of plaintiffs' tract.

As to Plaintiff's Exhibit 10, a copy of the recorded plat of Golden Goose subdivision, we remarked earlier that the exhibit appears to show that the east boundary of lot 109 is the east edge of the roadway. If that be correct—defendant evidently believes it is, as his letter to Slagle of June 16, 1986, requesting the survey cautioned Slagle against placing a stake in the road— it would not be necessary that the plat be based on a survey commenced at a government corner in order to show that the east boundary of lot 109 is the east edge of the roadway. The road, as a monument, marks the boundary, and monuments are controlling. *Hartvedt v. Harpst*, 173 S.W.2d 65, 70[16] (Mo.1943). We therefore hold that Exhibit 10 was competent evidence that the east boundary of lot 109 was the east edge of the roadway.

In considering defendant's first point we held that defendant's admission that the east boundary of plaintiffs' tract lay somewhere in the general area of the lines denominated "Lot Line" on Exhibit 4, coupled with Slagle's testimony as to the distance between the south end of the southernmost line and the shoreline, and the distance between the north end of the northernmost line and the shoreline, was sufficient to support a finding that plaintiffs' tract did not extend to the shoreline but instead lay some 30 feet or more west of the shoreline at the tract's southeast corner and some 20 feet or more west of the shoreline at the tract's northeast corner. We further held that defendant's admission regarding the two lines denominated "Lot Line" on Exhibit 4, coupled with Slagle's testimony regarding the projection from the south end of the southernmost line east to the shoreline and the projection from the north end of the northermost line east to the shoreline, and his testimony that the length of the shoreline between the points where the two projected lines intersected the shoreline was 80 feet, was sufficient to support a finding that the length of the shoreline east of the east boundary of plaintiffs' tract was not 100 feet, but instead was nearer 80 feet.

■ Plaintiffs, in seeking rescission, endeavored to prove they were induced to purchase the subject tract by three misrepresentations: (1) the tract extended to the shoreline, (2) the tract had 100 feet of shoreline, and (3) the well house was situated on the tract. We have found the evidence, viewed within the limits imposed by the trial court, sufficient to support a finding that the tract did not extend to the shoreline, and that the tract lay some 30 feet or more west of the shoreline at the tract's southeast corner and some 20 feet or more west of the shoreline at the tract's northeast corner. Additionally, we have held Plaintiff's Exhibit 10 sufficient to support a finding that the east edge of lot 109 is the east edge of the roadway. Slagle, it will be recalled, measured the distance from the shoreline to the south end of the southernmost "Lot Line" at the east edge of the roadway and found the distance was

37 feet. We have also found the evidence sufficient to support a finding that the shoreline east of the east boundary of the tract is not 100 feet long, but is instead nearer 80 feet. There was, consequently, sufficient evidence to prove misrepresentations "(1)" and "(2)," above.

There was not, however, sufficient evidence to prove misrepresentation "(3)" *if* we confine Exhibit 4 to the limits imposed by the trial court. As explained *supra*, in order to prove the well house did not sit on plaintiffs' tract it was essential that plaintiffs show where the west boundary of their tract lay on the ground. The only evidence plaintiffs presented that would have established where such boundary lay was Slagle's survey. The trial court, however, did not accept such evidence as a survey. Thus, viewing the evidence as the trial court did, there was a failure of proof as to misrepresentation "(3)."

Neither party specified any fact issues for the trial court to resolve, and the trial court made no factual findings. In such circumstances all fact issues shall be considered as having been found in accordance with the result reached, Rule 73.01(a)(2), Missouri Rules of Civil Procedure (19th ed. 1988), and the judgment will be upheld under any reasonable theory supported by the evidence. *Showe–Time Video Rentals, Inc. v. Douglas,* 727 S.W.2d 426, 428[1] (Mo.App.1987); *O'Bar v. Nickels,* 698 S.W. 2d 950, 955[1] (Mo.App.1985). It is thus arguable that we should make our own determination as to whether Plaintiff's Exhibit 4 and Slagle's testimony regarding the results of his survey had probative force as to the location and dimensions of the boundaries of plaintiffs' tract. If such evidence did, it would be sufficient to prove misrepresentation "(3)."

We need not, however, address the above question because, as henceforth explained, we hold misrepresentations "(1)" and "(2)" sufficient to warrant rescission.

According to plaintiffs, in deciding to buy the subject tract they relied on the representation that the tract extended to the shoreline and the representation that

the tract had 100 feet of shoreline. What they were deeded is a tract having an eastern boundary some 20 feet or more west of the shoreline at its nearest point and over 30 feet west of the shoreline at its farthest point, and a tract which has only some 80 feet of shoreline east of the tract's east boundary. Whitworth testified without objection that a parcel of land with 100 feet of lakefront would be worth more than a parcel with 80 feet of lakefront. Furthermore, it is evident that inasmuch as the deeded tract did not extend to the shoreline, plaintiffs received substantially less land than they believed they were buying. While there is no evidence as to the precise amount of the shortage, defendant's admission that the east boundary of the tract is somewhere in the general area of the lines denominated "Lot Line" on Exhibit 4 demonstrates that the shortage is significant. In *Cundiff v. Cline*, 752 S.W.2d 409, 412 (Mo.App.1988), the court discussed the materiality of misrepresentations with regard to the amount of land being conveyed, and noted cases where a deficiency as low as 11 per cent had been held material. *Id.* at 412 n. 2. The deficiency in the tract deeded to plaintiffs was obviously more than 11 per cent. We hold that the factors discussed in this paragraph are sufficient to entitle plaintiffs to rescission.

As the instant case was court-tried, the scope of our review is set forth in *Murphy v. Carron*, 536 S.W.2d 30, 32[1] (Mo. banc 1976). The judgment of the trial court will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. We hold that the judgment is supported by substantial evidence and is not against the weight of the evidence, and that the trial court neither erroneously declared the law nor erroneously applied the law. Defendant's second point is denied and the judgment is affirmed.

HOLSTEIN, C.J., and GREENE, J., concur.