The slip opinion is the first version of an opinion released by the Clerk of the Court of Appeals. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Clerk of the Court for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: **July 8, 2025**

**No. A-1-CA-41014**

**PETER B. KOMIS and DORINDA HOPPER-KOMIS,**

Plaintiffs-Appellants,

v.

**FARMERS INSURANCE COMPANY,**

Defendant-Appellee.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Bryan Biedscheid, District Court Judge**

Jones, Snead, Wertheim & Clifford, P.A.
Jerry Todd Wertheim
Carol A. Clifford
Santa Fe, NM

for Appellant Peter B. Komis

Sanders & Westbrook, P.C.
Maureen A. Sanders
Albuquerque, NM

for Appellant Dorinda Hopper-Komis

Cuddy & McCarthy, LLP
Scott P. Hatcher
Santa Fe, NM

for Appellee

**OPINION**

**BOSSON, Justice, retired, sitting by designation.**

{1}     Thirty years ago, our Supreme Court made clear that an uninsured/underinsured motorist (UM/UIM) policy may provide coverage for intentional torts committed by the occupants of an uninsured vehicle when the "intentional conduct and its resulting harm arises out of the use of [the] uninsured vehicle." *Britt v. Phoenix Indem. Ins. Co.*, 1995-NMSC-075, ¶¶ 15-16, 120 N.M. 813, 907 P.2d 994. In this case of horrific violence committed by occupants of an uninsured vehicle against Peter B. Komis, the district court made detailed, unchallenged factual findings that compel our conclusion, as a matter of law, that Komis's injuries did arise out of the use of the uninsured vehicle. The district court's contrary legal conclusion runs afoul of the teachings of our Supreme Court in *Britt* and *Britt*'s progeny. We therefore reverse the district court and hold that Komis's injuries are covered by his UM/UIM policy.

**BACKGROUND**

{2}     Komis was brutally attacked in the driveway of his home after returning from work one night. Three masked assailants beat Komis and shot him multiple times, leaving him with serious injuries that required extensive medical treatment. The attackers also shot pellets at Komis's wife, Dorinda Hopper-Komis, through the windows of the house, and unsuccessfully attempted to enter the residence. After the

attack, the assailants fled the scene, retreated to where they had parked their uninsured vehicle (approximately seventy yards from the residence), and drove away. Only 100 seconds passed from the moment the assailants entered the property to when they fled. The assailants were never apprehended or even identified. We provide additional facts and procedural history as it becomes relevant to our analysis.

## DISCUSSION

{3}     Komis and Hopper-Komis (collectively, Plaintiffs) appeal from the district court's order entering declaratory judgment in favor of Defendant Farmers Insurance Company of Arizona (Farmers). Plaintiffs argue that the district court erred by (1) misapplying *Britt*, and (2) granting summary judgment in Farmers' favor on Hopper-Komis's bodily injury claim. We address each argument in turn.

## I.      The District Court's Application of *Britt*

{4}     *Britt* "is the seminal New Mexico case that articulates the test for determining whether intentional conduct and its resulting harm arises out of the use of an uninsured vehicle." *Crespin v. Safeco Ins. Co. of Am.*, 2018-NMCA-068, ¶ 15, 429 P.3d 968 (internal quotation marks and citation omitted). Under the three-part test,

> the trier of fact first considers whether there is a sufficient causal nexus between the use of the uninsured vehicle and the resulting harm. *The causal nexus requires the vehicle to be an active accessory in causing the injury.* Second, if there is a sufficient causal nexus, the trier of fact next considers whether an act of independent significance broke the causal link between the use of the vehicle and the harm suffered. Finally, the trier of fact must consider whether the 'use' to which the vehicle was put was a normal use of that vehicle.

2

*Barncastle v. Am. Nat'l Prop. & Cas. Cos.*, 2000-NMCA-095, ¶¶ 7-8, 129 N.M. 672, 11 P.3d 1234 (emphasis added) (internal quotation marks and citations omitted).

{5}  Applying the *Britt* test in this case, the district court concluded that the third prong was satisfied. Under the first prong, however, the district court found that there was an insufficient causal nexus because the vehicle was not an "active accessory" to the attack. *Id.* ¶ 7 (internal quotation marks and citation omitted). The district court did not reach *Britt*'s second prong: "whether an act of independent significance broke the causal link between the use of the vehicle and the harm suffered." *Britt*, 1995-NMSC-075, ¶ 15.

{6}  We review the district court's legal conclusions de novo. *Ponder v. State Farm Mut. Auto. Ins. Co.*, 2000-NMSC-033, ¶ 7, 129 N.M. 698, 12 P.3d 960. "If challenged on appeal, the [district] court's findings will be examined only to the extent necessary to determine whether they are supported by substantial evidence." *Crespin*, 2018-NMCA-068, ¶ 14; *accord Ponder*, 2000-NMSC-033, ¶ 7. If left unchallenged, the district court's findings are binding upon this Court. *Baker v. Endeavor Servs., Inc.*, 2018-NMSC-035, ¶ 2, 428 P.3d 265 ("Unchallenged findings of fact are binding on [an appellate c]ourt."). "[W]here a conclusion conflicts with, or does not follow, a finding of fact, the finding of fact controls and [we] will apply the proper conclusion of law." *Sachs v. Bd. of Trs. of Town of Cebolleta Land Grant*, 1976-NMSC-076, ¶ 24, 89 N.M. 712, 557 P.2d 209.

## A.    The Applicable Law

{7}    As the seminal case on this issue, we begin with reviewing *Britt*, which arose out of a routine, rear-end car collision. 1995-NMSC-075, ¶ 2. When a passenger left the first car to inspect the damage, "a physical altercation ensued" with two passengers from the other vehicle. *Id.* The passenger from the first car retreated to his car, but one of the passengers from the other vehicle "pursued him and stabbed him through the open passenger-door window." *Id.* As in the case involving Komis, "[t]he identity of the assailants and the other vehicle were never established." *See id.* On these facts, our Supreme Court concluded that "there well may have been a sufficient causal link between the use of the uninsured vehicle for transportation and [the plaintiff's] injuries." *Id.* ¶ 16. The Court was unable to decide definitively whether the facts of *Britt* satisfied the three-part test, however, because "a crucial issue of fact," "the state of mind of the uninsured vehicle's operator at the time of the collision," had not yet been answered. *Id.* But the Court concluded that the *Britt* test would "probably" be satisfied if the driver of the uninsured vehicle intentionally collided with the first car in order to facilitate the attack. *Id.*

{8}    In the next case, *State Farm Mutual Automobile Insurance Co. v. Blystra*, 86 F.3d 1007 (10th Cir. 1996), the United States Court of Appeals for the Tenth Circuit held that a vehicle used to commit a drive-by shooting was an active accessory under the *Britt* test. *Id.* at 1012. The Court concluded in *Blystra* that the use of an

4

"automobile is almost by definition an 'active accessory'" to a drive-by shooting because it offers "several advantages in the commission of [the] crime that would otherwise be unavailable to [the perpetrator]." *Id.* These advantages are:

> First, the assailant can use the vehicle to unsuspiciously and quickly approach [their] victim, all the while hiding from public observation that [the assailant] is armed with a gun. Second, during the commission of the assault, the assailant can use the vehicle to help hide his identity. Third, the assailant can use the vehicle to leave the scene quickly and avoid apprehension.

*Id.*

{9}    Although not a drive-by shooting case, this Court in *Barncastle* incorporated *Blystra*'s analysis of the advantages acquired by using a vehicle in the commission of a crime. *Barncastle*, 2000-NMCA-095, ¶ 9. In *Barncastle*, the victim was shot by the passenger of a vehicle that pulled up alongside his car at a red light "in an innocent manner which concealed the upcoming events." *Id.* ¶ 10 (internal quotation marks omitted). The passenger got out of the vehicle, "walked over to [the victim's] window, and shot him with a handgun. Immediately thereafter, [the passenger] returned to the unidentified vehicle. Then the unidentified vehicle left the scene at a high rate of speed with its headlights off." *Id.* ¶ 2. Because "[t]he driver of [the] vehicle used it to get into a position where [the a]ssailant could get out and shoot [the victim]," and "[t]he vehicle was further used to escape the scene at a high rate of speed," we concluded that the vehicle was an "integral element of the shooting,"

and therefore, an active accessory to the attack under *Britt*'s first prong. *Id.* ¶ 9 (omission, internal quotation marks, and citation omitted).

{10} Plaintiffs in this case also rely on *Miera v. State Farm Mutual Automobile Insurance Co.*, in which this Court observed that the vehicle in question "amounted to little more than a holster on wheels" because "[i]t held both a person[, the assailant,] and an instrumentality[, a gun, that the driver] knew to be dangerous." 2004-NMCA-059, ¶ 14, 135 N.M. 574, 92 P.3d 20. Accordingly, this Court concluded that there was a triable issue of fact whether using the vehicle "to carry the accessible weapon resulted in the [vehicle] being used to facilitate [the] intentional tort." *Id.* ¶ 15. After *Miera*, parties seeking to prove that a vehicle was used "to facilitate [an] attack based on . . . access to weapons" in the vehicle must demonstrate, at a minimum, that the weapons were kept "in the vehicle to facilitate [the] attack[]." *McKinley v. Interinsurance Exch. of the Auto. Club*, 2022-NMCA-055, ¶ 12, 517 P.3d 937.

{11} This caselaw applying *Britt*'s three-part test demonstrates that when an uninsured vehicle is used to gain certain advantages in carrying out an attack—such as storing weapons for the purpose of facilitating the attack, *id.*; concealing the perpetrator's identities; and escaping, *see Blystra*, 86 F.3d at 1012; *Barncastle*, 2000-NMCA-095, ¶¶ 9-10; *McKinley*, 2022-NMCA-055, ¶ 11—the vehicle is considered an "active accessory." This can be true even if an assailant leaves the

uninsured vehicle to carry out the attack. *See Barncastle*, 2000-NMCA-095, ¶ 9; *see also Blystra* 86 F.3d at 1014 ("[G]iven the right facts, the causal chain might not be broken even though the assailant commits his assault after exiting the stopped vehicle."); *cf. Britt*, 1995-NMSC-075, ¶¶ 2, 16 (observing that the *Britt* test may have been satisfied by a tort perpetrated by an assailant after they left their vehicle). With this in mind, we turn to the factual findings in this case to determine whether the district court properly applied the law.

**B.    The District Court's Factual Findings**

{12}    The district court made the following factual findings regarding the assailants' use of an uninsured vehicle:

> On the night of the attack, the assailants parked their vehicle or vehicles in the public parking spot that was both close to [Plaintiffs'] residence and in front of a business, rather than a private residence, and this parking spot was outside of the area monitored by the residence's security cameras.
>
> From this parking spot, the assailants were able to quickly exit their vehicle, enter [Plaintiffs'] property through the still-open driveway gate, perpetrate their attack, return to their vehicle quickly, and drive away from the scene without attracting significant attention.
>
> . . . .
>
> The use of a vehicle allowed the assailants to hide their weapons from view as they approached [Plaintiffs'] residence and as they drove away from the attack and provided a means to leave the area of the attack quickly.
>
> . . . .

7

The assailants parked their vehicle approximately 70 yards from [Plaintiffs'] residence driveway, apparently balancing the need for a quick escape with the need to avoid the attention that would be caused by parking in front of a residence.

The attack on Mr. Komis was a planned attack that could not have been completed using a ride sharing platform or public transportation and proceeding on foot was not feasible either.

[The assailants] greatly increase[d] their chances of avoiding detection by using a vehicle to leave the scene of the attack.

. . . .

Plaintiff[s] proved by the preponderance of the evidence that the assailants used an uninsured motor vehicle to transport themselves and their weapons to the parking space near [Plaintiffs'] residence, that they exited the vehicle approximately 70 yards from [Plaintiffs'] property to conduct their attack, and that they returned to the vehicle in its parked location with their weapons following the attack and drove away.

{13}   These extensive factual findings distinguish this case from those on which Farmers relies: *Crespin* and *Mendoza v. Dairyland Ins. Co.*, No. 1:18-CV-0362-SWS-MLC, 2018 WL 7354717 (D.N.M. Dec. 13, 2018). In *Crespin*, the district court concluded there was an insufficient "causal nexus between the use of the vehicle and the resulting harm" because it found that "the vehicle was used only to transport [the victim] to [where the sexual assault occurred]" and the victim entered and left the vehicle voluntarily. 2018-NMCA-068, ¶¶ 11, 29; *cf. id.* ¶ 29 (concluding that the uninsured vehicle "was not an integral element of the sexual assault . . . [in part because] the vehicle did not provide [the assailant] with any physical or proximal advantage in committing the sexual assault"). Similarly, in *Mendoza*, the

federal district court found that the "[u]se of the vehicle . . . did not facilitate the assault; rather, the vehicle merely facilitated transportation to and from the scene of the crime." 2018 WL 7354717 at *4. Additionally, the *Mendoza* court found that "the vehicle served no purpose in helping the assailant avoid apprehension." *Id.*

{14}    In the case before us, the district court's findings demonstrate that the assailants used their vehicle for far more than mere transportation. Unlike the factual findings in *Crespin* and *Mendoza*, the district court's findings in this case illustrate that the uninsured vehicle was an active accessory because it provided the assailants with significant advantages "that would [have] otherwise be[en] unavailable to [them]." *Blystra*, 86 F.3d at 1012.

{15}    According to the district court, the vehicle provided a means of transporting weapons used in the planned attack and hiding them from view until the assailants began their attack. It allowed the assailants to get into a position where they could get out of the vehicle, "enter the [Plaintiffs'] property through the still-open driveway gate, perpetrate their attack, return to their vehicle quickly, and drive away from the scene without attracting significant attention." The vehicle facilitated the assailants' swift flight from the scene of the crime, thereby improving their chance of avoiding apprehension. The district court also found that the attack on Komis "could not have been completed using a ride[-]sharing platform or public transportation and proceeding on foot was not feasible either."

{16}    Although we "construe findings of the district court so as to uphold a judgment rather than to reverse it[,] . . . specific findings of fact supported by substantial evidence will prevail over any inconsistent conclusions of law." *Aquifer Sci., LLC v. Verhines*, 2023-NMCA-020, ¶ 27, 527 P.3d 667. Farmers does not challenge any of the district court's findings as being unsupported by substantial evidence, and we are therefore bound by these findings on appeal. *See Baker*, 2018-NMSC-035, ¶ 2 ("Unchallenged findings of fact are binding on [an appellate c]ourt."). Because the district court's conclusion in this case conflicts with its findings of fact, "the finding[s] of fact control[] and [we] will apply the proper conclusion of law." *Sachs*, 1976-NMSC-076, ¶ 24.

{17}    Accordingly, we hold that the district court's findings in this case satisfy *Britt*'s first prong because the uninsured vehicle was an active accessory in the attack, and therefore, there was a sufficient causal nexus between the use of the uninsured vehicle and Komis's injuries. *See Barncastle*, 2000-NMCA-095, ¶ 9; *Blystra*, 86 F.3d at 1012; *cf. McKinley*, 2022-NMCA-055, ¶¶ 11-13, 15 (providing that evidence demonstrating a vehicle is used to store weapons in anticipation of an attack, or as a means of facilitating escape, lends support for concluding that the vehicle was used to facilitate the attack).

## C.     The Causal Chain Was Not Broken

{18}     In the interest of judicial efficiency, we address the second prong of the *Britt* test: "whether an act of independent significance broke the causal link between the use of the vehicle and the harm suffered." *See Barncastle*, 2000-NMCA-095, ¶ 8 (internal quotation marks and citation omitted); *State v. Jason F.*, 1998-NMSC-010, ¶ 22, 125 N.M. 111, 957 P.2d 1145 (choosing to address an issue unnecessary to the court's disposition "[i]n the interests of judicial efficiency and economy" because the issue was likely to arise on remand). To satisfy the second prong, the uninsured vehicle must have been intentionally used "to facilitate the attack." *Britt*, 1995-NMSC-075, ¶ 16.

{19}     Although the district court never reached this prong of the *Britt* test, it found that "[t]he assailants drove to the parking spot near the [Plaintiffs'] residence intending to attack Peter Komis" and found that their attack on him was "planned." Because the district court's unchallenged findings demonstrate that the intent to attack Komis did not develop independently of the assailants' use of the uninsured vehicle, the causal chain was not broken. *See Blystra*, 86 F.3d at 1013-14 (providing that an "assailant must disassociate [their] assault from the vehicle's use to create a break in the causal chain"); *Barncastle*, 2000-NMCA-095, ¶ 10 (concluding that "[n]o act of independent significance broke the causal chain" because the "vehicle was the instrumentality which is perhaps the major component in the incident,

11

clearly facilitating the attack" (internal quotation marks omitted)). As in *Barncastle*, "[t]his is not a case of an intentional tort being committed simply after the tortfeasor exited the vehicle." 2000-NMCA-095, ¶ 10 (internal quotation marks omitted).

{20}    Given our conclusions that the first and second prong of the *Britt* test have been satisfied, and because Farmers does not challenge the district court's conclusion that the third prong was "proven in favor of Plaintiff[s]," we hold that all three prongs of the *Britt* test were satisfied in this case. The district court therefore erred by granting declaratory judgment in Farmers' favor.

## II.    Hopper-Komis's Bodily Injury Claim

{21}    At the time of the attack on Komis, Plaintiffs were named insureds under two automobile insurance policies (the Policies) issued by Farmers. The Policies provided UM/UIM coverage for bodily injury with limits of $250,000 per person and $500,000 per accident. Farmers agreed to "pay all sums which an insured person is legally entitled to recover as damages from the owner or operator of an uninsured motor vehicle because of: (a) [b]odily injury sustained by the insured person." The Policies expressly defined "bodily injury" as "bodily injury to or sickness, disease or death of any person."

{22}    Komis filed a claim under the Policies for his injuries, which Farmers denied. Plaintiffs then filed a complaint seeking a declaration that they each suffered bodily injuries during the attack that fell within the Policies' UM/UIM coverage. Farmers

moved for summary judgment on Hopper-Komis's claims, arguing that she failed to demonstrate she suffered a bodily injury and that she could not recover under the Policies for loss of consortium. The district court granted Farmers' motion for summary judgment on Hopper-Komis's bodily injury claim in part because it concluded that her "allegations of legitimate traumatization and fears arising from the [attack] forming the basis of her claim for 'bodily injury' do not satisfy the requirements for 'bodily injury' recognized by the [c]ourts." We review the district court's grant of summary judgment de novo. *Barncastle*, 2000-NMCA-095, ¶ 5.

{23}     On appeal, Plaintiffs argue that Hopper-Komis suffered a bodily injury under the Policies because "she was sweating and shaking, and her heart was beating fast" when the attackers chased her into her house, and because she experienced sleeplessness, lived in "constant fear," and was unable to go outside after dark for over a year after the attack. Plaintiffs also argue that "the term 'bodily injury' is, at best, ambiguous and should be construed against the drafter when it is a term used in an insurance policy." In the alternative, Plaintiffs claim that Hopper-Komis's injuries fall within the Policies' definition of "bodily injury" because the definition encompasses nonphysical injuries.[1]

---

[1]Plaintiffs also argue that construing the Policies' definition of "bodily injury" to exclude emotional or mental injury is barred by NMSA 1978, Section 66-5-301 (1983). But Plaintiffs do not respond to Farmers' contention that this claim of error was not preserved for appellate review. *See* Rule 12-321(A) NMRA ("To preserve an issue for review, it must appear that a ruling or decision by the trial court was

13

{24}     Plaintiffs contend that they were unable to find any New Mexico cases that have "grappled with the [precise] question of whether an emotional or mental injury could be viewed as a 'sickness or disease,'" and thus fall within the definition of "bodily injury" under the Policies. Our existing caselaw, however, is close enough.

{25}     At least three New Mexico cases have addressed the meaning of "bodily injury" as it is defined in the Policies, and they have unanimously concluded that such a definition of bodily injury is unambiguous and does not provide coverage for the type of emotional or mental injuries experienced by Hopper-Komis. In *Gonzales v. Allstate Insurance Co.*, our Supreme Court held that "[b]y its plain meaning, 'bodily injury'[, defined as 'bodily injury, sickness, disease or death,'] constitutes injury to the physical body rather than mental and emotional injuries." 1996-NMSC-041, ¶ 16, 122 N.M. 137, 921 P.2d 944. This Court in *Economy Preferred Insurance Co. v. Jia* relied on *Gonzales* to conclude that "[u]nder New Mexico law," the insurance policy's definition of "bodily injury" as "'bodily harm, sickness or

---

fairly invoked."). We interpret Plaintiffs' lack of response as a concession that this issue was not preserved, *see Delta Automatic Sys., Inc. v. Bingham*, 1999-NMCA-029, ¶ 31, 126 N.M. 717, 974 P.2d 1174 (providing that when an appellant does not respond to arguments made in an answer brief, "such a failure to respond constitutes a concession on the matter"), and we therefore decline to decide the issue, *see Ullman v. Safeway Ins. Co.*, 2023-NMSC-030, ¶ 77, 539 P.3d 668 ("It is the role of appellate courts to review the case litigated below, not the case that is fleshed out for the first time on appeal." (internal quotation marks and citation omitted)); *In re Lewis*, 2024-NMCA-078, ¶ 10, 558 P.3d 367 ("Generally, a court sitting in an appellate capacity will not review an issue raised for the first time on appeal." (internal quotation marks and citation omitted)).

disease, including death that results' . . . unambiguously excludes emotional injury." 2004-NMCA-076, ¶¶ 7-8, 135 N.M. 706, 92 P.3d 1280. Based on this conclusion, the *Jia* Court held that "crying, shaking, and sleep difficulties" did not qualify as bodily injuries under the policy's definition of the term. *Id.* ¶ 10; *see also Hart v. State Farm Mut. Ins. Co.*, 2008-NMCA-132, ¶¶ 3, 5, 10, 145 N.M. 18, 193 P.3d 565 (holding that "trouble sleeping . . . [,] emotional distress, . . . feelings of anxiety, . . . increased agitation and irritability, [feeling] very anxious and fearful, suffer[ing] lowered self-esteem, . . . bec[oming] unable to concentrate and amotivational[,] . . . [and] experiencing cognitive confusion" did not constitute a bodily injury under a UM policy that defined the term as "bodily injury to a person and sickness, disease or death which results from it").

{26}    Plaintiffs ask us to "re-examine the definition of 'bodily injury' as it relates to emotional injury in light of the changing views of society in general and in the courts specifically regarding the interplay between physical and emotional or mental damages." We do not have authority, however, to reconsider our Supreme Court's holding in *Gonzales* that when "bodily injury" is defined as it is here, emotional or mental injuries are unambiguously excluded from coverage. *See* 1996-NMSC-041, ¶ 16; *State v. Mares*, 2024-NMSC-002, ¶ 33, 543 P.3d 1198 ("It is axiomatic that our justice system requires strict adherence to vertical stare decisis, which is the principle that lower courts are bound by the precedent of reviewing courts.").

{27} We similarly decline to depart from this Court's holdings in *Jia* and *Hart*. *See State v. Dirickson*, 2024-NMCA-038, ¶ 27, 547 P.3d 781 ("Based on the importance of stare decisis, we require a compelling reason to overrule one of our prior cases." (internal quotation marks and citation omitted)). We also reject the argument that the definition of "bodily injury" is ambiguous, or that the Policies' definition includes emotional or mental injuries, because Plaintiffs ignore controlling caselaw to the contrary. *See Gonzales*, 1996-NMSC-041, ¶ 16; *Jia*, 2004-NMCA-076, ¶¶ 7-8; *Hart*, 2008-NMCA-132, ¶¶ 3, 5, 10.

{28} Even accepting the argument that Hopper-Komis experienced physical manifestations of her emotional injuries, Plaintiffs fail to distinguish these physical symptoms from the symptoms this Court determined did not qualify as bodily injuries in *Jia* and *Hart*. *See Jia*, 2004-NMCA-076, ¶¶ 9-10 (concluding that "hysterical crying, uncontrollable shaking and various sleep difficulties such as crying uncontrollably [while a]sleep, insomnia, and nightmares" did not constitute bodily injuries, and distinguishing these physical symptoms from "emotional distress result[ing] in physical pain, or an easily measurable condition such as high blood pressure" (citation omitted)); *Hart*, 2008-NMCA-132, ¶¶ 5, 10. Absent an argument that Hopper-Komis's sleeplessness, generalized fear, or the temporary physical symptoms (sweating, shaking, and increased heart rate) that she experienced during the attack are meaningfully different from the symptoms

16

discussed in *Jia* and *Hart*, we conclude that Plaintiffs have failed to demonstrate the district court erred by granting summary judgment. *See, e.g.*, *Hall v. City of Carlsbad*, 2023-NMCA-042, ¶ 5, 531 P.3d 642 ("We emphasize . . . that it is the appellant's burden to persuade us that the district court erred" because, "[o]n appeal, there is a presumption of correctness in the rulings and decisions of the district court, and the party claiming error must clearly show error." (internal quotation marks and citations omitted)).

**CONCLUSION**

{29}     For the foregoing reasons, we reverse the district court's grant of declaratory judgment against Plaintiffs and in favor of Farmers. We affirm the district court's grant of summary judgment in favor of Farmers on Hopper-Komis's bodily injury claim. We remand to the district court for further proceedings consistent with this opinion.

{30}     **IT IS SO ORDERED.**

_____
**RICHARD C. BOSSON, Justice,**
**Retired, Sitting by Designation**

17

**WE CONCUR:**

_____
**JACQUELINE R. MEDINA, Chief Judge**

_____
**JANE B. YOHALEM, Judge**